**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RREEF INFRASTRUCTURE (G.P.) LIMITED and RREEF PAN-EUROPEAN INFRASTRUCTURE TWO LUX S.A.R.L.,<br><br>                    Petitioners,<br><br>     v.<br><br>KINGDOM OF SPAIN,<br><br>                         Respondent. | Civil Action No. 1:19-cv-03783-CJN<br><br>**Hon. Carl J. Nichols**<br><br><br>**Oral Argument Requested** |

**MEMORANDUM OF LAW IN SUPPORT OF THE KINGDOM OF SPAIN'S
MOTION TO DISMISS THE PETITION OR STAY THE PROCEEDING**

Ana C. Reyes (D.C. Bar No. 477354)
Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel.:     (202) 434-5000
Fax:     (202) 434-5029
Email:   areyes@wc.com

Csaba M. Rusznak (D.C. Bar No. 1030310)
SOVEREIGN ARBITRATION ADVISORS LLC
1050 Connecticut Avenue, N.W., Ste. 66255
Washington, DC  20035
crusznak@sovereignarbitration.us

*Counsel for the Kingdom of Spain*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION .................................................................................................. 1

BACKGROUND .................................................................................................. 3

    A.    The Parties ...................................................................................... 3

    B.    The Applicable Legal Framework ......................................................... 3

        1.    The legal order of the European Union............................................ 3

        2.    The impermissibility of international arbitration by Member States concerning matters of EU law...................................................... 5

        3.    The European Commission's state-aid decision regarding Spain............... 9

        4.    The Energy Charter Treaty ...................................................... 10

    C.    The Arbitration............................................................................ 11

STANDARD OF REVIEW ...................................................................................... 13

ARGUMENT .................................................................................................... 14

I.    THE PETITION FAILS FOR LACK OF SUBJECT-MATTER JURISDICTION. ......... 14

    A.    The "Arbitration Exception" in Section 1605(a)(6) Does Not Apply. ........... 15

        1.    Under EU law, there was no agreement to arbitrate. ........................... 15

        2.    The EU's interpretation of its own law is binding on the Court............... 18

    B.    The "Waiver Exception" in Section 1605(a)(1) Does Not Apply. ................ 20

II.    THE PETITION SHOULD BE DISMISSED UNDER THE FOREIGN SOVEREIGN COMPULSION DOCTRINE.................................................... 24

III.    THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT. .................... 25

IV.    IN THE ALTERNATIVE, THE PETITION SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*. ........................................... 26

V.    IN THE ALTERNATIVE, THE CASE SHOULD BE STAYED PENDING RESOLUTION OF THE ANNULMENT PROCEEDINGS............................................. 30

CONCLUSION.................................................................................................. 32

# TABLE OF AUTHORITIES

**European Union Cases**                                                    **Page(s)**

\* *Achmea B.V. v. Slovak Republic*,
   CJEU Case No. C-284/16, ECLI:EU:C:2018:158 (6 Mar. 2018).................................. *passim*

\* *Achmea B.V. v. Slovak Republic*,
   German Federal Court of Justice *Case* No. 1 ZB 2/15 (31 Oct. 2018)................................6, 7

*Budějovický Budvar v. Rudolf Ammersin GmbH*,
   CJEU Case No. C-478/07, ECLI:EU:C:2009:521 (8 Sept. 2009) .............................................4

*In re ECHR*,
   CJEU Opinion 2/13, ECLI:EU:C:2014:2454 (18 Dec. 2014) .............................................4, 5

*Jersey Produce Marketing Organisation Ltd v. States of Jersey et al.*
   CJEU Case C-293/02, ECLI:EU:C:2005:664 (8 Nov. 2005) ................................................18

*Puligienica Facility Esco SpA (PFE) v Airgest SpA*,
   CJEU Case No. C-689/13, ECLI:EU:C:2016:199 (5 Apr. 2016) .............................................5


**International Treaties**

Convention on the Settlement of Investment Disputes between States
   and Nationals of Other States ("ICSID Convention") .................................................... *passim*

Energy Charter Treaty ("ECT").......................................................................................... *passim*

Treaty on European Union ("TEU")........................................................................................4, 5

Treaty on the Functioning of the European Union ("TFEU") ........................................4, 5, 10, 19


**Federal Cases**

*Air France v. Saks*,
   470 U.S. 392 (1985)...............................................................................................................19

*Al Tech Specialty Steel Corp. v. United States*,
   28 Ct. Int'l Trade 1468 (C.I.T. 2004) ...................................................................................18

*Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*,
   138 S. Ct. 1865 (2018)..........................................................................................................18

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)......................................................................................14

*Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank*,
　251 F. Supp. 2d 126 (D.D.C. 2003)..............................................................27

*Balkan Energy Ltd. v. Republic of Ghana*,
　302 F. Supp. 3d 144 (D.D.C. 2018)..............................................................15

*BCB Holdings Ltd. v. Gov't of Belize*,
　650 F. App'x 17 (D.C. Cir. 2016)..................................................................29

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
　668 F.3d 724 (D.C. Cir. 2012).......................................................................31

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*,
　137 S. Ct. 1312 (2017)...................................................................................23

*Chevron Corp. v. Republic of Ecuador*,
　795 F.3d 200 (D.C. Cir. 2015).......................................................................16

*Creighton Ltd. v. Gov't of State of Qatar*,
　181 F.3d 118 (D.C. Cir. 1999).......................................................................21

*Elec. Indus. Co. v. Epstein*,
　516 U.S. 367 (1996)......................................................................................25

*F.T.C. v. Compagnie De Saint-Gobain-Pont-a-Mousson*,
　636 F.2d 1300 (D.C. Cir. 1980).....................................................................24

*Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*,
　665 F.3d 384 (2d Cir. 2011)....................................................................27, 29

*Foremost–McKesson, Inc. v. Islamic Republic of Iran*,
　905 F.2d 438 (D.C. Cir. 1990).......................................................................22

*Friends of All Children, Inc. v. Lockheed Aircraft Corp.*,
　717 F.2d 602 (D.C. Cir. 1983).......................................................................28

*Granite Rock Co. v. Teamsters*,
　561 U.S. 287 (2010)......................................................................................25

*Gulf Oil Corp. v. Gilbert*,
　330 U.S. 501 (1947)......................................................................................27

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
　139 S.Ct. 524 (2019).....................................................................................15

*In re Air Crash Over Southern Indian Ocean*,
    352 F. Supp. 3d 19 (D.D.C. 2018) ................................................................................. 27, 30

*In Re Monegasque de Réassurance S.A.M. (Monde Re) v. Nak Naftogax of Ukraine*,
    311 F.3d 488 (2d Cir. 2002) .................................................................................................... 29

*In re Sealed Case*,
    825 F.2d 494 (D.C. Cir. 1987) ................................................................................................ 24

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001) ...................................................................................................... 28

*Irwin v. World Wildlife Fund, Inc.*,
    448 F. Supp. 2d 29 (D.D.C. 2006) .......................................................................................... 28

*Lamps Plus, Inc. v. Varela*,
    139 S. Ct. 1407 (2019) ............................................................................................................ 26

*Landis v. N. Am. Co.*,
    299 U.S. 248 (1936) ................................................................................................................ 30

*Maritime Int'l Nominees Establishment v. Republic of Guinea*,
    693 F.2d 1094 (D.C. Cir. 1982) .............................................................................................. 25

*Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*,
    397 F. Supp. 3d 34 (D.D.C. 2019) .......................................................................................... 28

*Medellin v. Texas*,
    552 U.S. 491 (2008) ................................................................................................................ 19

*Micula v. Gov't of Romania*,
    104 F. Supp. 3d 42 (D.D.C. 2015) .......................................................................................... 14

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
    863 F.3d 96 (2d Cir. 2017) ...................................................................................................... 14

\* *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*,
    850 F.2d 756 (D.C. Cir. 1988) ................................................................................................ 15

*Nemariam v. Fed. Democratic Republic of Ethiopia*,
    491 F.3d 470 (D.C. Cir. 2007) ................................................................................................ 14

*Newco Ltd. v. Gov't of Belize*,
    650 F. App'x 14 (D.C. Cir. 2016) ........................................................................................... 29

*Nygard v. DiPaolo*,
    753 F. App'x 716 (11th Cir. 2018) .......................................................................................... 28

*Permanent Mission of India to the U.N. v. City of New York*,
 551 U.S. 193 (2007)................................................................................14

*Phx. Consulting Inc. v. Republic of Angola*,
 216 F.3d 36 (D.C. Cir. 2000)..................................................................23

*Pitney Bowes, Inc. v. U.S. Postal Serv.*,
 27 F. Supp. 2d 15 (D.D.C. 1998).............................................................13

*Price v. Socialist People's Libyan Arab Jamahiriya*,
 294 F.3d 82 (D.C. Cir. 2002)..................................................................30

*Republic of Austria v. Altmann*,
 541 U.S. 677 (2004)................................................................................25

*Richards v. Duke Univ.*,
 480 F. Supp. 2d 222 (D.D.C. 2007).........................................................13

*Rong v. Liaoning Provincial Gov't*,
 362 F. Supp. 2d 83 (D.D.C. 2005), *aff'd*, 452 F.3d 883 (D.C. Cir. 2006)..............................13

*Saudi Arabia v. Nelson*,
 507 U.S. 349 (1993)................................................................................14

*Simon v. Republic of Hungary*,
 911 F.3d 1172 (D.C. Cir. 2018)..............................................................30

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
 549 U.S. 422 (2007)................................................................................26

*Smith-Haynie v. District of Columbia*,
 155 F.3d 575 (D.C. Cir. 1998)................................................................14

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
 559 U.S. 662 (2010)................................................................................26

*Sumitomo Shoji Am., Inc. v. Avagliano*,
 457 U.S. 176 (1982)................................................................................19

*Tatneft v. Ukraine*,
 301 F. Supp. 3d 175 (D.D.C. 2018).........................................................23

*Tatneft v. Ukraine*,
 771 Fed. App'x 9 (D.C. Cir. 2018).....................................................22, 23

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
 411 F.3d 296 (D.C. Cir. 2005)...........................................................29, 30

*Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*,
455 U.S. 691 (1982)................................................................................................25

*Vanover v. Hantman*,
77 F. Supp. 2d 91 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002)...............14

*W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l*,
493 U.S. 400 (1990)...............................................................................................25

*World Wide Minerals, LTD v. Republic of Kazakhstan*,
296 F.3d 1154 (D.C. Cir. 2002) .............................................................................21

**Statutes and Rules**

Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*.................................................23

\* Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602–1611 .................... *passim*

ICSID Convention Implementing Statute, 22 U.S.C. § 1650a ...........................2, 14, 25

D.C. Circuit Court of Appeals Rule 36(e) ...................................................................22

Federal Rule of Civil Procedure 12(b)(1) ...................................................................13

Federal Rule of Civil Procedure 12(b)(6) ...................................................................14

## INTRODUCTION

With their Petition, two European companies have traveled far abroad to the courts of the United States in an attempt to enforce a European arbitral award, about a European dispute, against a European sovereign.  Petitioners come here because if they had sought to enforce their award in any of the courts of the European Union—all of which are available fora for this case—those courts would have rejected their efforts under well-settled law.  Petitioners well know this because those courts have already rejected similar efforts by other arbitral claimants.  This case therefore presents a straightforward question:  whether Petitioners can use the courts of the United States to avoid decisions of European courts about European law as applied to European disputes.  Under principles of sovereign immunity and international comity, they cannot.

The Petition fails for at least four reasons.  *First*, the Court lacks jurisdiction under the Foreign Sovereign Immunities Act ("FSIA").  The Kingdom of Spain is presumptively immune to the jurisdiction of U.S. courts, and none of the exceptions to the FSIA applies because there was no agreement to arbitrate and no waiver of immunity.  Petitioners sought to initiate arbitration by accepting a purported offer to arbitrate in the Energy Charter Treaty ("ECT"), a multilateral investment treaty among fifty-three contracting parties, including Spain, a majority of the Member States of the European Union ("EU"), and the EU itself.  But as the EU and its Member States have long maintained—since well before Petitioners brought their claims—the ECT's arbitration provision does not extend to disputes with Member States that require the application of EU law.  Instead, those disputes must be heard in court.

Petitioners thus proceeded at their own risk when they chose to pursue arbitration—if the Member States were right about the ECT's arbitration provisions, any resulting award would be invalid and unenforceable.  That risk materialized:  In the seminal *Achmea* decision, the EU's highest court, the Court of Justice, held that such arbitration provisions are incompatible with EU

law and thus void *ab initio*.  In other words, under binding EU law, the ECT does not contain a valid offer to arbitrate on the part of Spain.  That means there was no offer for Petitioners to accept and thus no agreement to arbitrate.  As a result, the Award is unenforceable and Spain is immune to the Court's jurisdiction.  *See* **Part I**.

*Second*, granting the Petition would violate the foreign sovereign compulsion doctrine.  Under EU law, payment of the award is unlawful because it would (i) constitute state aid that has not been approved by the European Commission and which Spain is therefore prohibited from paying; and (ii) compel Spain to violate a decision of the Court of Justice.  Comity requires that U.S. courts not take action that would cause the violation of another nation's laws.  *See* **Part II**.

*Third*, the Petition should be denied because the Award is not entitled to "full faith and credit."  22 U.S.C. § 1650a(a).  An arbitral award is entitled to full faith and credit only if it would be recognized as "a final judgment of a court of general jurisdiction of one of the several States."  *Id.*  But federal courts decline to enforce judgments where, as here, the tribunal or court lacked jurisdiction.  The Tribunal lacked jurisdiction over Spain because there was no agreement to arbitrate, and it lacked subject-matter jurisdiction to issue an award that constitutes unlawful state aid.  The Tribunal's award, issued over Spain's jurisdictional objections, is therefore unenforceable.  *See* **Part III**.

*Fourth*, if there were any question about the EU law above (Spain submits there is none), then the Court should dismiss the Petition under the doctrine of *forum non conveniens*.  Resolving any dispute would require the Court to wade into complex matters of EU law and the ECT, a treaty to which the United States is not party.  Granting the Petition would require this Court to offer an interpretation of EU law contrary to the EU Court of Justice, undermining that sister court, violating principles of international comity, and inviting a flood of enterprising petitioners into this District.  The Court should decline that invitation.  *See* **Part IV**.

In the alternative, the Court should at a minimum stay this case until Spain's pending application to annul the Award is resolved by the ICSID *ad hoc* committee.  *See* **Part V**.

## BACKGROUND

This enforcement action arises out of an investment arbitration initiated by Petitioners against the Kingdom of Spain in December 2013, alleging various violations of the Energy Charter Treaty.  That proceeding was administered by the International Centre for the Settlement of Investment Disputes ("ICSID") and registered as Case No. ARB/13/30.  The Tribunal issued a Decision on Jurisdiction on June 6, 2016, *see* ECF No. 1-1 at 42; a Decision on Responsibility and on the Principles of Quantum on November 30, 2018, *see id.* at 110; and an Award on December 11, 2019, *see id.* at 5.  Petitioners quickly filed this action on December 19, 2019.

### A.      The Parties

Respondent is the Kingdom of Spain, a foreign sovereign and a Member State of the European Union.  Award ¶ 6.  Petitioners are RREEF Infrastructure (G.P.) Limited, incorporated under the laws of the Bailiwick of Jersey, and RREEF Pan-European Infrastructure Two Lux S.à.r.l., incorporated under the laws of the Grand Duchy of Luxembourg.  *Id.* ¶¶ 2, 3.  The former is the general partner of a European investment fund; the latter is one of its investment vehicles that held energy investments in Spain.  *Id.* ¶¶ 4, 5.

### B.      The Applicable Legal Framework

#### 1.      The legal order of the European Union

Spain is one of the twenty-seven Member States of the European Union ("EU").  Decl. of Prof. Steffen Hindelang ("Hindelang Decl.") (May 29, 2020) ¶ 24.[1]  The EU's foundational

---

[1]  Steffen Hindelang is a Professor at the University of Southern Denmark, where he specializes in the laws of the European Union and public international law.  He has written extensively on the relationship between EU law and international investment treaties.  A copy of his curriculum vitae is attached to his declaration as Exhibit 1.

instruments are the Treaty on European Union (the "TEU," Hindelang Decl. Ex. 8) and the

Treaty on the Functioning of the European Union (the "TFEU," Hindelang Decl. Ex. 9).[2]  *Id.*

The EU is comprised of several branches of government.  These include the European Council,

which defines the EU's overall political direction and priorities; the European Parliament, which

enacts legislation; the European Commission, which "oversee[s] the application of Union law

under the control of the Court of Justice of the European Union"; and the EU Court of Justice,

which is the final authority on issues of EU law.  *See* TEU, Arts. 14(1), 15(1), 17(1), 19.

EU law applies throughout the EU and within each Member State.  By joining the EU,

each Member State agreed that EU law takes precedence and overrides any conflicting domestic

law, rule, or governmental action.  This principle of primacy is fundamental to the legal order

within the Europe Union.  Hindelang Decl. ¶¶ 29, 40–41.

EU law also trumps incompatible rules of law that EU Member States may have

purported to create, including in international agreements or treaties concluded among them.

Hindelang Decl. ¶ 40.  The EU Court of Justice has held that, as a matter of the Member States'

delegation of sovereignty and the primacy of the EU Treaties, "an international agreement cannot

affect the allocation of power fixed by the EU [Treaties] or, consequently, the autonomy of the

EU legal system." *In re ECHR*, CJEU Op. 2/13 ¶ 201 (Hindelang Decl. Ex. 21).  Thus, treaty

provisions that "concern two Member States . . . cannot apply in the relations between those

States if they are found to be contrary to the rules of the [EU Treaties]." *Budějovický Budvar*,

CJEU Case No. C-478/07, ¶ 98 (Hindelang Decl. Ex. 16).

---

[2]  European legal authorities and similar materials cited in this Memorandum of Law are attached
to the Hindelang Declaration, along with an index of exhibits that follows his signature page.

The EU Court of Justice is the supreme judicial authority on EU law with exclusive jurisdiction to determine the content, scope, and application of the EU's foundational documents. *See* Hindelang Decl. ¶ 33.  It is composed of twenty-seven judges, one from each Member State. TFEU, Art. 253.  The EU Treaties oblige the Member States to support the jurisdiction of the EU Court of Justice and not to circumvent or hamper its authority.

The EU Treaties implement a regime to ensure the Court of Justice alone is empowered to interpret EU law.  *See* Hindelang Decl. ¶ 34.  This principle of autonomy is fundamental to the legal order of the European Union, and the EU Treaties protect that principle in two ways.  *First*, Article 267 of the TFEU requires that the highest national court of each Member State "shall" refer questions on EU law to the EU Court of Justice for a preliminary ruling.  The EU Court of Justice's decision is "binding on the national court," which is further "required to do everything necessary to ensure that that interpretation of EU law is applied."  *Puligienica Facility*, CJEU Case No. C-689/13, ¶¶ 37–38, 42 (Hindelang Decl. Ex. 25).  *Second*, Article 344 of the TFEU forbids EU Member States from submitting "a dispute concerning the interpretation or application of the Treaties [EU law] to any method of settlement other than" their national courts.  As a result, EU Member States lack authority to establish dispute-resolution bodies, including arbitral tribunals, outside the EU judicial system that might be called upon to interpret or apply EU law.  *In re ECHR*, CJEU Op. 2/13 ¶¶ 212–13; *see* Hindelang Decl. ¶ 35.

### 2. The impermissibility of international arbitration by Member States concerning matters of EU law.

Consistent with these foundational principles of delegated sovereignty under the EU Treaties, the EU Court of Justice, the European Commission, and the European Union itself have consistently opined that Member States may not offer or submit to arbitration that may touch upon matters of EU law.

a.    ***The ruling of the Court of Justice in* Achmea v. Slovak Republic**

In 2018, the EU Court of Justice issued a seminal decision in *Slovak Republic v. Achmea B.V.*, CJEU Case No. C-284/16, (Hindelang Decl. Ex. 4), which addresses the ability of Member States to submit disputes to international arbitration.

*Achmea* concerned an investment arbitration between the Slovak Republic and a Dutch claimant.  The investor initiated proceedings under the dispute-resolution mechanism in a bilateral investment treaty ("BIT") between the Netherlands and the Slovak Republic, by which each state made a standing offer to arbitrate disputes with investors of the other state.  *Achmea* ¶ 6.  The treaty was signed in 1991.  On May 1, 2004, the Slovak Republic became a member of the EU, thereby ceding sovereignty to the EU and binding itself to comply fully with EU law. *Id.*  In 2008, the Dutch company initiated arbitration under the BIT.  *Id*. ¶ 9.  The Slovak Republic objected to the tribunal's jurisdiction, arguing that its accession to the EU rendered the arbitration clause invalid and unenforceable.  *Id*. ¶¶ 11, 14.  The tribunal disagreed, exercised jurisdiction in the case, and eventually rendered an award in favor of the investor.  *Id*. ¶ 12.

The Slovak Republic moved to set aside the award at the arbitral seat in Germany, arguing that the BIT's dispute-resolution mechanism was invalid under EU law and therefore could not be exercised by the national of another EU Member State.  Recognizing that the case presented a question of EU law, the German court referred the case to the EU Court of Justice for a preliminary determination.  The Court of Justice assigned the case to its Grand Chamber for hearing[3] and received submissions from the parties, the European Commission, and sixteen EU Member States.  After deliberation, the Court issued a unanimous opinion:  The EU Treaties

---

[3]  The EU Court of Justice ordinarily sits in panels of three or five judges.  Significant cases are assigned to a Grand Chamber of fifteen judges, including the Court's President and Vice President.  *See Achmea* ¶ 14; Statute of the Court of Justice, Art. 16 (Hindelang Decl. Ex 13).

"preclud[e] a provision in an international agreement concluded between Member States, such as Article 8 of the [applicable bilateral investment treaty], under which an investor from one of those Member States may . . . bring proceedings against [another] Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept." *Achmea* ¶ 62. The Court of Justice's reasoning is straightforward:  Under the EU Treaties, Member States lack authority to submit disputes that may require the interpretation of EU law to adjudication outside the judicial system of the European Union (e.g., to arbitral tribunals).  Thus, any putative offer to arbitrate such disputes was void *ab initio*.  Hindelang Decl. ¶ 39.

On remand, the German Federal Court of Justice was presented with the same question as this Court:  whether the arbitral award was enforceable following *Achmea*.  *See* Hindelang Decl. ¶ 54.  Under German law, an arbitral award will not be enforced if "the arbitration agreement is not valid" or "absen[t]" under the applicable law.  *Achmea*, Case No. I ZB 2/15, ¶ 15 (Nov. 8, 2018) (Hindelang Decl. Ex. 5).  The German court observed that the claimant attempted to create an arbitration agreement through Article 8 of the BIT, which appears to "contain[] an offer by the contracting states to conclude arbitration agreements with investors" of the other state.  *Id.* ¶ 17.  But under EU law, the Slovak Republic lacked the ability to make a legally binding offer to arbitrate:  "by acceding to the [European] Union, the member states have restricted their international powers . . . and have waived among themselves the exercise of international contractual rights that conflict with Union law."  *Id.* ¶ 41.  *Achmea* held that the BIT's arbitration conflicts with EU law.  Thus, the German court held that "[*t*]*here is therefore no offer* to conclude an arbitration agreement" in the BIT.  *Id.* ¶ 28 (emphasis added).  And because there was no valid offer for the claimant to accept, "*there is no arbitration agreement* in the relationship between the parties."  *Id.* ¶ 14 (emphasis added).

The German court held that the award was unenforceable and dismissed the case.

### b.      *The view of the European Commission and European Union*

The holding of the EU Court of Justice echoes the long-held position of the European
Commission, which has "consistently taken the view that intra-EU BITs . . . are contrary to
Union law since they are incompatible with provisions of the Union Treaties and should
therefore be considered invalid."  European Commission Decision 2015/1470 ¶ 102 (Mar. 30,
2015) ("State Aid Decision 2015/1470") (Hindelang Decl. Ex. 59).  As early as 2006, the EU and
several Member States objected that arbitral tribunals lack jurisdiction to hear claims by
nationals of EU Member States against other Member States, insofar as those claims address
matters of EU law.  *See, e.g.*, *Eastern Sugar B.V. v Czech Republic*, SCC Case No 088/2004,
Partial Award (Mar. 27, 2007) at ¶ 119 (Hindelang Decl. Ex. 3); Hindelang Decl. ¶ 17 & n.1.

Following *Achmea*, the European Commission formally notified the European Parliament
and the European Council of the Court of Justice's holding, explaining that investors governed
by EU law "cannot have recourse to arbitration tribunals established" under investment treaties,
including "under the Energy Charter Treaty."  *Communication from the Commission to the*
*European Parliament and the Council: Protection of intra-EU investment*, COM (2018) 547
(July 19, 2018) ("EC Communication 547") at 26 (Hindelang Decl. Ex. 52).

The European Union, too, has affirmed that *Achmea* means that "as between EU Member
States, Article 26 of the ECT is inapplicable . . . and therefore cannot have given rise to a valid
arbitration agreement."  Amicus Brief of the European Union, ECF No. 30-1 at 20, *Novenergia*
*II – Energy & Environment (SCA) EU v. Kingdom of Spain*, Civ. No. 18-1148 (D.D.C. Sept. 24,
2019) (Hindelang Decl. Ex. 53) at 20.

### c.      *The position of the EU Member States*

Consistent with the Commission's view, nearly all EU Member States, including Spain,
have since confirmed their understanding of the EU Treaties—i.e., that an arbitration agreement

cannot be formed under multilateral treaties like the ECT that apply between an EU Member

State and a national of another Member State.  On January 15, 2019, twenty-two EU Member

States, including Spain, jointly declared that pursuant to *Achmea* an "arbitral tribunal established

on the basis of investor-State arbitration clauses" in bilateral investment treaties between EU

Member States "lacks jurisdiction, due to a lack of a valid offer to arbitrate."  *Declaration of the*

*Representatives of the Governments of the Member States on the Legal Consequences of the*

*Judgment of the Court of Justice in Achmea and on Investment Protection in the European*

*Union* (Jan. 15, 2019) (the "Joint Declaration") at 1 (Hindelang Decl. Ex. 6).  This declaration

was made specifically inclusive of the ECT, under which Petitioners initiated the underlying

proceedings in this case:  "For the Energy Charter Treaty, its systemic interpretation in

conformity with the [EU] Treaties precludes intra-EU investor-State arbitration."  *Id*. at 2 n.2.

### 3.  The European Commission's state-aid decision regarding Spain

Arbitration between Member States and investors of other Member States cannot be

enforced for a second reason:  Paying the award constitutes unlawful state aid under EU law.

The EU Treaties prohibit Member States from granting subsidies to private actors—

referred to as "state aid"—that "might disrupt or threaten to distort competition" in any economic

sector.  Hindelang Decl. ¶ 74.  The European Commission has the sole authority to permit an EU

Member State to pay such subsidies, and it alone is empowered to review and evaluate such

measures to determine their legality under EU law.

On November 10, 2017, the European Commission issued a binding decision regarding

Spain's regulatory scheme for providing support in the electricity sector.  *See* Decision

2017/7384 (Nov. 10, 2017) ("State Aid Decision 2017/7384") (Hindelang Decl. Ex. 58).  That

decision was the result of an independent proceeding commenced on December 22, 2014 by the

European Commission regarding Spain's renewable energy policy, in which interested parties,

including investors like Petitioners and a trade association representing renewable energy producers, made written submissions. *See id.* ¶ 1.

The European Commission's decision highlights two aspects of EU law that are relevant here. *First*, it determined that the subsidies for renewable energy production—the ones that formed the basis of Petitioners' claim in the underlying arbitration—"constitute State aid within the meaning of Article 107(1) TFEU." *Id.* ¶ 88. It also determined that Spain's implementation of the subsidy regime, in part because it benefited investors like Petitioners, was "in breach of Article 108(3) TFEU," which governs "all systems of aid existing in [the Member] States." *Id.* at 34; *see also id.* ¶ 89 ("The aid granted until the adoption of this decision is unlawful aid").

*Second*, observing that investors were bringing claims against Spain under the ECT, the Commission explained that "any compensation which an Arbitration Tribunal were to grant to an investor" in respect of the subsidies that were the subject of Spain's regulatory reforms in the energy sector "would constitute in and of itself State aid." *Id.* ¶ 165. As a result, Spain, as an EU Member State, cannot pay any such award without the European Commission's prior review and authorization. To dispel any possible misunderstanding on the issue, the European Commission explained that its decision "is part of Union law" and therefore "binding on Arbitration Tribunals, where they apply Union law." *Id.* ¶ 166. The decision is also binding on private parties, like Petitioners, who are subject to enforcement actions by the European Commission if they receive unlawful state aid.

### 4.     The Energy Charter Treaty

The Energy Charter Treaty is a multilateral investment treaty among fifty-three contracting parties, including Spain, the EU and many of its Member States, and certain Eurasian states. The United States is not a signatory. The ECT provides for resolution of disputes through arbitration under various arbitral rules, including those set forth in the ICSID Convention. ECF No. 1-2.

Arbitral tribunals constituted under the ICSID Convention are required to "decide a dispute in accordance with such rules of law as may be agreed by the parties."  ICSID Convention, Art. 42(1).  As applied to this case, the contracting parties agreed that the Tribunal would decide the dispute in accordance with the ECT "and applicable rules and principles of international law," including EU law.  ECT, Art. 26(6).

### C.      The Arbitration

On October 22, 2013, Petitioners commenced arbitration against Spain, purportedly invoking the dispute-resolution provision under Article 26 of the Energy Charter Treaty.  *See* Decision on Responsibility, ECF No. 1-1 at 110, ¶ 15.  A three-member arbitral tribunal was constituted on July 31, 2014.  *Id.* ¶ 19.

Petitioners' claims arose from their investment in Spain's energy sector.  The merits of the dispute centers on Spain's right to create, regulate, and modify subsidies for renewable-energy producers operating in Spain.  For many years, Spain has supported the development of renewable-energy production in accordance with its own national interests, its international commitments, and the EU's commitment to producing clean energy and reducing greenhouse gases.  *Id.* ¶ 87.  To further these objectives, Spain enacted legislation that created a special incentive regime to encourage the production of renewable energy.  *Id*. ¶ 91.  Subsequently, and in parallel with the international financial crisis that began in 2008, Spain adopted new legislation to address unsustainable growth in the tariff deficit, which resulted from the special subsidized regime and a drop in demand for electricity, among other factors.  *Id*. ¶¶ 98–102.  Petitioners claimed these energy-sector reforms negatively affected their investments in Spain and violated several provisions of the ECT.  *Id*. ¶ 10.

From the outset of the arbitration, Spain objected to the tribunal's jurisdiction on the ground that the arbitration provision of Article 26 of the ECT does not apply to disputes between

an EU Member State and investors of another EU Member State (i.e., "intra EU-disputes").

Decision on Jurisdiction, ECF No. 1-1 at 42, ¶¶ 37–56.  Spain explained that the proper process

for resolving these intra-EU disputes was to seek relief before a court or tribunal that is a part of

the EU's judicial system, which would ensure final recourse to the EU Court of Justice and

compliance with EU Treaties.  *Id*. ¶¶ 46, 47.  And, indeed, the courts of the Member States are

available fora for resolving Petitioners' claims.  *See* Hindelang Decl. ¶¶ 49, 50.  The European

Commission twice sought leave to intervene in the arbitration, as provided for in the ICSID

Arbitration Rules, and to file an *amicus curiae* brief on the question of the Tribunal's jurisdiction

over intra-EU disputes.  Decision on Responsibility ¶ 22.  The Tribunal refused to consider the

European Commission's position and rejected its applications to intervene.  *Id*. ¶¶ 25, 31.  The

Tribunal issued its Decision on Jurisdiction on June 6, 2016.[4]

On December 11, 2019, the Tribunal issued an Award in favor of Petitioners.  ECF No.

1-1 at 5.  The Tribunal found that Spain violated certain obligations under the ECT by modifying

the subsidy scheme and frustrating Petitioners' legitimate expectations regarding the profitability

of their investment.  *Id.* ¶ 81.  The Tribunal ordered Spain to pay EUR 59.6 million, plus interest.

*Id*.  Rather than seeking to enforce the Award against Spain in Europe, the most natural place for

enforcement against a European sovereign, Petitioners sought relief from this Court on

December 19, 2019.  ECF No. 1.  They did so well before the expiration of the timeline for

annulment of the Award.

Under Article 52 of the ICSID Convention, Spain had the right to seek annulment of the

Award before an ICSID *ad hoc* Annulment Committee within 120 days of the date of the Award.

---

[4]  The EU Court of Justice decided *Achmea* on March 6, 2018, well after the Tribunal conducted
the merits hearing in this matter in March 2017.

It did so on April 8, 2020.  The Annulment Committee is empowered to annul the Award, in whole or in part, on various grounds, including that the tribunal "was not properly constituted," "manifestly exceeded its powers," or "failed to state the reasons" for its decision.  ICSID Convention, Art. 52(1)(a)–(b), (e).  Enforcement of the Award was automatically stayed upon Spain's request in its application for annulment.  *Id*. at Art. 52(5); *see also* ICSID Arbitration Rules, Rule 54(2) ("If an application for the revision or annulment of an award contains a request for a stay of its enforcement, the Secretary-General shall, together with the notice of registration, inform both parties of the provisional stay of the award.").  Once the *ad hoc* Annulment Committee is constituted, it will decide whether to continue the automatic stay for the duration of the annulment proceedings.

## STANDARD OF REVIEW

Spain moves to dismiss the Petition for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  When ascertaining jurisdiction under Rule 12(b)(1), "a court is not limited to the allegations in the complaint, but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 90 (D.D.C. 2005) (collecting cases), *aff'd*, 452 F.3d 883 (D.C. Cir. 2006).  "Because subject matter jurisdiction focuses on the Court's power to hear a claim, however, the Court must give the plaintiff's factual assertions closer scrutiny when reviewing a motion to dismiss for lack of subject matter jurisdiction" and "no presumption of truthfulness applies to the factual allegations" in the Petition.  *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 231–32 (D.D.C. 2007) (internal quotation marks omitted).  "The plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence." *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998).

Spain also raises the affirmative defense of foreign sovereign compulsion under Federal Rule of Civil Procedure 12(b)(6).  Under Rule 12(b)(6), the Court must accept well-pleaded allegations in the Petition as true, but need not accept asserted inferences or conclusory allegations.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court may also consider documents that are "referred to in the complaint" or are "central to the plaintiff's claim." *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) (considering materials produced and pleadings submitted in underlying administrative proceeding), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002).  The Court may grant a motion to dismiss under Rule 12(b)(6) on the basis of an affirmative defense "when the facts that give rise to the defense are clear from the face of the complaint."  *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998).

## ARGUMENT

## I.     THE PETITION FAILS FOR LACK OF SUBJECT-MATTER JURISDICTION.

This action should be dismissed for lack of subject-matter jurisdiction.  As a sovereign state, Spain is entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"), which provides the sole basis for obtaining jurisdiction over a foreign state in federal court.  *See Permanent Mission of India to the U.N. v. City of New York*, 551 U.S. 193, 197 (2007).[5]  Under the FSIA, a foreign state is "presumptively immune from the jurisdiction of United States courts."  *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993).

The FSIA specifies certain exceptions, but "[i]n the absence of an applicable exception, the foreign sovereign's immunity is complete—[t]he district court lacks subject matter jurisdiction over the plaintiff's case."  *Nemariam v. Fed. Democratic Republic of Ethiopia*, 491

---

[5]  The federal statute that implements the ICSID Convention, 22 U.S.C. § 1650a, does not provide a separate basis of jurisdiction.  *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 112 (2d Cir. 2017); *Micula v. Gov't of Romania*, 104 F. Supp. 3d 42, 44 (D.D.C. 2015) (ICSID awards must be enforced by plenary action in accordance with the FSIA).

F.3d 470, 474 (D.C. Cir. 2007) (alterations in original) (internal quotation marks omitted).

"Because 'subject matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity' laid out in the FSIA, as a 'threshold' matter in every action against a foreign state, a district court 'must satisfy itself that one of the exceptions applies.'" *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 150–51 (D.D.C. 2018) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493–94 (1983)).

### A.      The "Arbitration Exception" in Section 1605(a)(6) Does Not Apply.

The arbitration exception provides that a foreign sovereign is not immune to jurisdiction in an action to enforce "an award made pursuant to [ ] an agreement to arbitrate . . . governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards[.]"  28 U.S.C. § 1605(a)(6).  The exception does not apply because there was no agreement to arbitrate.

Where parties "disagree as to whether they ever entered into any arbitration agreement at all, the court must resolve that dispute" on its own accord and without reliance on the underlying decision of the tribunal because "if there was never an agreement to arbitrate, there is no authority to require a party to submit to arbitration."  *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 761 (D.C. Cir. 1988) (internal quotations omitted); *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.Ct. 524, 530 (2019) ("the court determines whether a valid arbitration agreement exists").

### 1.      Under EU law, there was no agreement to arbitrate.

As an initial matter, the ECT is not an arbitration agreement.  In this respect, investment treaties are distinct from more-common arbitration clauses in commercial agreements.  Unlike such contracts, the investor is not a party to the treaty.  Rather, investment treaties that provide for arbitration contain a standing offer by states to arbitrate that investors can later accept when a

dispute arises.  *See, e.g.*, *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 205 n.3 (D.C. Cir. 2015) (explaining that the bilateral investment treaty between the United States and Ecuador is not an ordinary contract between private parties, but rather "includes a standing offer to all potential U.S. investors to arbitrate investment disputes, which [the claimant] accepted in the manner required by the treaty").

There was no agreement to arbitrate because EU law precludes Spain from making an offer to arbitrate matters that may require the interpretation or application of EU law where, as here, the putative claimants are nationals of states to which EU law applies.  Under *Achmea*, if the ECT is a treaty by which Member States would "remove from the jurisdiction of their own courts . . . disputes which may concern the application or interpretation of EU law," *Achmea* ¶ 55, then a Member State's putative agreement to submit to arbitration under that treaty is void *ab initio*.  Hindelang Decl. ¶ 39.  The Member States cannot make offers to arbitrate claims under those circumstances; they lost that ability when they acceded to the European Union. Furthermore, *Achmea*'s reasoning applies to any "international agreement concluded between Member States." *Achmea* ¶ 57.  The fact that the ECT is a multilateral treaty and not a bilateral treaty between two EU Member States is immaterial.  Just a year after *Achmea*, the Court of Justice applied the same reasoning to a multilateral trade treaty.  *See* Hindelang Decl. ¶¶ 45, 56.

In this case, it is undisputed that the ECT removes disputes from the jurisdiction of EU courts; that is the very nature of arbitral process.  And it is also undisputed that the Tribunal was called upon to resolve "disputes which may concern the application or interpretation of EU law." *Achmea* ¶ 55.  That is clear for two reasons.  *First*, the ICSID Convention requires tribunals to "decide a dispute in accordance with such rules of law as may be agreed by the parties."  ICSID Convention, Art. 42(1).  Under the ECT, the contracting parties agreed that an arbitral tribunal is

bound to decide the dispute in accordance with the ECT "and applicable rules and principles of international law."  ECT, Art. 26(6).  The EU Treaties are international law.  Hindelang Decl. ¶¶ 27–29.  *Second*, the Tribunal agreed that EU applied to the parties' dispute.  The Tribunal expressly understood itself to be engaged in a "process of interpretation" to find a "harmonious or harmonizing interpretation" of EU law.  Decision on Jurisdiction ¶¶ 76, 77.  As a matter of law, Spain is not empowered to agree to arbitrate claims that "may concern the application or interpretation of EU law."  *Achmea* ¶ 55.  For this reason, there was no valid offer to arbitrate and thus no valid agreement to arbitrate.

Separately, Spain notes that this argument applies equally to both Petitioners, notwithstanding RREEF Infrastructure (G.P.) Limited's status as a national of Jersey.  The holding in *Achmea* concerns Spain's ability to make a valid offer to arbitrate.  *Achmea* holds that a Member State, like Spain, cannot make a valid offer to arbitrate a claim that "may concern the application or interpretation of EU law."  *Achmea* ¶ 55.  A dispute between a Jersey claimant and Spain involves EU law.  *See* Hindelang Decl. ¶¶ 68–70.  As the European Commission explained during the United Kingdom's accession to the EU,[6] "Jersey, a British Crown dependency, is part of the Union in so far as the United Kingdom is responsible for its external relations."  Written Question P-3620/02 to the Commission on the Position of Jersey in the EU, OJ C 242E (Sept. 10, 2003) (Hindelang Decl. Ex. 51).  The Court of Justice later held that because EU law "on customs matters and quantitative restrictions are to apply to the Channel Islands and the Isle of Man 'under the same conditions as they apply to the United Kingdom[,]' . . . the Channel Islands [including Jersey], the Isle of Man and the United Kingdom must be treated as one Member

---

[6]  At all times relevant to this case, from the filing of the claim through the rendering of the Award, the United Kingdom was a Member State of the EU.

State." *Jersey Produce Marketing Organisation*, CJEU Case C-293/02, ¶ 46 (Hindelang Decl. Ex. 50). Moreover, the Tribunal understood itself—without objection from Petitioners—to be interpreting and applying EU law to both Petitioners and their claims without distinguishing between them. *See* Decision on Jurisdiction ¶¶ 76, 77; Decision on Responsibility ¶ 600 (awarding relief to "Claimants" jointly).

## 2.    The EU's interpretation of its own law is binding on the Court.

The views of the EU Court of Justice, the European Union and its Members States, and the European Commission on matters of EU law and the ECT are binding rules of decision on this Court.

*First*, the EU Court of Justice has final authority to interpret EU law. Under EU law, the Court of Justice has the authority to determine the scope of Member States' ability to enter into arbitration agreements.[7] The Court of Justice has exercised its authority under the EU Treaties to declare incompatible with EU law—i.e., unconstitutional—arbitration provisions in international agreements like the ECT. The Court must follow that decision. *Al Tech Specialty Steel Corp. v. United States*, 28 Ct. Int'l Trade 1468, 1503 (C.I.T. 2004) (affording conclusive weight on the issue of EU law to a decision of the EU Court of Justice); *see also Animal Sci. Prods. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1874 (2018) (analogizing the process of determining foreign law to the rules for ascertaining state law, and observing that the decisions of a state's highest court are "binding on the federal courts" in deciding the content of state law).

*Second*, the Court must give deference to the interpretation of the ECT reached by the European Union and its Member States. Where parties to a treaty "agree as to the meaning of a

---

[7] That should not be surprising. The U.S. Constitution contains similar restrictions limiting the validity of agreements between states: "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State[.]" U.S. Const., Art. I, § 10, cl. 3.

treaty provision, and that interpretation follows from the clear treaty language, [a court] must, absent extraordinarily strong contrary evidence, defer to that interpretation." *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 185 (1982); *see also Medellin v. Texas*, 552 U.S. 491, 507 (2008) ("'postratification understanding' of signatory nations" to a treaty aids its interpretation); *Air France v. Saks*, 470 U.S. 392, 404 (1985) ("we find the opinions of our sister signatories to be entitled to considerable weight" in interpreting treaties). Such deference is particularly compelling where, as here, the United States is not a party to the treaty at issue.

The European Union, which is a party to the applicable treaty, has explained that "the interpretation of Article 267 and 344 of the TFEU adopted in *Achmea* applies to intra-EU investor-State arbitration under the ECT[.]" Proposed Amicus Brief of the European Union (Hindelang Decl. Ex. 53) at 13. Thus, "any offer of intra-EU arbitration contained in the ECT is . . . ineffective and cannot have given rise to a valid arbitration agreement[.]" *Id.* at 14. That view is echoed by the joint declaration of twenty-two EU Member States, which explained that an "arbitral tribunal established on the basis of investor-State arbitration clauses" in investment treaties between and among EU Member States "lacks jurisdiction, due to a lack of a valid offer to arbitrate." Hindelang Decl. Ex. 6 at 2; *see also id.* n.2 (expressly referencing the Energy Charter Treaty). The European Commission shares this view, explaining that claims against Member States cannot be heard by "arbitration tribunals established . . . under the Energy Charter Treaty." *Communication from the Commission to the European Parliament and the Council: Protection of intra-EU investment*, COM (2018) 547 (July 19, 2018) 26 (Hindelang Decl. Ex. 52).

\*     \*     \*

The fact that there was no agreement to arbitrate—and that the Award is therefore unenforceable—should come as no surprise to Petitioners.  When they chose arbitration under the ECT in 2013, Petitioners were on notice of these jurisdictional risks.  Member States and the European Commission had publicly objected to the validity of such arbitration provisions since at least 2006.  The EU Court of Justice's 2018 decision in *Achmea* merely confirmed that they had been right all along.  Petitioners' choice of arbitration was motivated, no doubt, by hopes of avoiding such jurisdictional objections—and in that regard, it was unsurprisingly successful.  Arbitral tribunals routinely deny challenges to their own jurisdiction.[8]  In this case, the Tribunal saw itself as the organ of an independent legal order, twice denying requests by the European Commission to submit briefs on matters of EU law and taking the ECT as its "constitution."  Decision on Jurisdiction ¶ 74.  That was, of course, a mistake:  Tribunals derive their power exclusively from the agreement of the parties.  And the decision of an arbitral tribunal constituted without such agreement has no legal effect.  Petitioners' forum shopping has now left them without an enforceable award.  But that is their burden.  Petitioners could have pursued their claims against Spain in any of the EU courts, *see* Hindelang Decl. ¶¶ 48–50, just as EU law requires.

**B.     The "Waiver Exception" in Section 1605(a)(1) Does Not Apply.**

Petitioners also argue that Spain "is not entitled to immunity from this Court's jurisdiction in an action to enforce an ICSID Convention award because it has waived that immunity by agreeing to the ICSID Convention."  Pet. ¶ 3.  Section 1605(a)(1) provides that

---

[8]  Perhaps because, as Prof. Hindelang observes, "intra-EU investment arbitration accounts for roughly twenty percent" of the market, "which would instantly disappear if the intra-EU objection is accepted."  Hindelang Decl. ¶ 22 n.8.

"[a] foreign state shall not be immune" when "the foreign state has waived its immunity either explicitly or by implication[.]"  Spain did not waive its immunity, either explicitly or impliedly.

*First*, Spain did not expressly waive immunity.  "An express waiver under section 1605(a)(1) must give a clear, complete, unambiguous, and unmistakable manifestation of the sovereign's intent to waive its immunity."  *World Wide Minerals, LTD v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002).  The Petition does not attempt to identify any text in the Convention that would effect an explicit waiver—and there is none.  To the contrary, the Convention expressly preserves the signatories' sovereign immunity.

The Convention addresses the role of domestic courts in Chapter IV, Section 6, entitled "Recognition and Enforcement of the Award."  Article 54 provides that each signatory "shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award . . . as if it were a final judgment[.]"  But the Convention quickly clarifies that "[n]othing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or any foreign State from execution."  ICSID Convention, Art. 55; *see also* Christoph Schreuer, *The ICSID Convention*, 1154 (2d ed. 2009) (the Convention does nothing to displace domestic "law governing the immunity from execution of judgments and arbitral awards").

*Second*, Spain did not impliedly waive immunity.  The D.C. Circuit has observed that "[t]he FSIA does not define 'implied waiver'" and instructs that the implied waiver provision must therefore be construed "narrowly."  *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 122 (D.C. Cir. 1999).  In particular, the D.C. Circuit has held that an implied waiver requires that "the foreign state . . . intended to waive its sovereign immunity."  *Id.*  Circumstances for implied waiver are few.  The D.C. Circuit has recognized only three: where "(1) a foreign state has

21

agreed to arbitration in another country; (2) a foreign state has agreed that the law of a particular country governs a contract; or (3) a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity." *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990).

The second and third circumstances do not apply; there is no contract, and Spain has raised the defense of sovereign immunity in this pleading.  Instead, Petitioners appear to argue that Spain's accession to the ICSID Convention constitutes an agreement to arbitrate.  That argument fails at the outset—ratification of the Convention does not constitute a general agreement to arbitrate claims.  As the preamble to the Convention declares, "no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration[.]"  Nor was there any agreement to arbitrate Petitioners' claims in particular.  *See* Part I.A, *supra*.  A state cannot be said to have waived immunity to the enforcement of an award arising out of a claim it did not agree to arbitrate.  A contrary outcome would be illogical.

The Petition cites *Tatneft v. Ukraine*, 771 Fed. App'x 9 (D.C. Cir. 2018), ostensibly in support of its implied-waiver argument.  Pet. ¶ 3.  In that case, the D.C. Circuit held that Ukraine waived its immunity by agreeing to arbitrate claims under the New York Convention, "a treaty in which signatories agree to enforce arbitral awards made in other signatory countries."  *Id.* at 9.  That holding was sufficiently unremarkable that the D.C. Circuit disposed of the *Tatneft* appeal in an unpublished opinion, seeing "no precedential value in that disposition."  D.C. Cir. R. 36(e).  In any event, *Tatneft* is unavailing as applied to the facts of this case because it begins with the fundamental premise that there was a valid agreement to arbitrate.  Ukraine never argued that the

bilateral investment treaty at issue was invalid or that its offer to arbitrate could not be accepted (as Spain does here). Rather, Ukraine argued instead that the tribunal's award was "not made 'pursuant to'" that agreement because the tribunal exceeded its power in awarded damages on theories of recovery that were not cognizable under the treaty. *Tatneft v. Ukraine*, 301 F. Supp. 3d 175, 187 (D.D.C. 2018) (arguing that the claimant's a "fair and equitable treatment" claim and request for damages on behalf of parent investors were *ultra vires*). This case thus diverges from *Tatneft* at the first step: There was no valid agreement to arbitrate.

*Tatneft* also involved a dispute "governed by the New York Convention[,]" not the ICSID Convention. *Id.* at 187. The New York Convention applies in the United States only to "commercial" disputes and is codified in the Federal Arbitration Act ("FAA"). 9 U.S.C. § 202. As Petitioners observe, the FAA "does 'not apply to enforcement of awards rendered pursuant to the [ICSID] convention.'" Pet. ¶ 6 (quoting 22 U.S.C. § 1650a(a)). The ICSID Convention is a separate regime that expressly preserves sovereign immunity; it does nothing to waive those protections. *See* ICSID Convention, Art. 55. As the State Department advised when Congress implemented the ICSID Convention, "there is nothing in the convention that will change the defense of sovereign immunity." H.R. 15785 Hearing at 18 (statement of Andreas F. Lowenfeld, Deputy Legal Advisor, Dep't of State). Because Spain did not agree to arbitrate Petitioners' claims, there can be no waiver of its sovereign immunity.[9]

---

[9] Unless the Court separately dismisses the Petition under the doctrine of *forum non conveniens*, *see* Part V *infra*, the Court must resolve the question of subject-matter jurisdiction before considering the merits of the Petition. That is because the Court "must make the critical preliminary determination of its own jurisdiction as early in the litigation as possible." *Phx. Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000). "[T]o defer the question is to 'frustrate the significance and benefit of entitlement to immunity from suit.'" *Id.* Importantly, Spain has the "right to take an immediate appeal" for denial of immunity under the collateral-order doctrine. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1323 (2017) (collecting cases).

## II.    THE PETITION SHOULD BE DISMISSED UNDER THE FOREIGN SOVEREIGN COMPULSION DOCTRINE.

Under the foreign sovereign compulsion doctrine, a U.S. court should refrain from entering an order that would compel a party to act in contravention of the laws of a foreign sovereign.  The D.C. Circuit instructs that "[p]rinciples of international comity require that domestic courts not take action that may cause the violation of another nation's laws."  *F.T.C. v. Compagnie De Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1327 (D.C. Cir. 1980); *see also In re Sealed Case*, 825 F.2d 494, 498–99 (D.C. Cir. 1987) ("We have little doubt . . . that our government and our people would be affronted if a foreign court tried to compel someone to violate our laws within our borders.").  The doctrine thus provides a "foreign party" with "protection from being caught between the jaws of [a U.S. court] judgment and the operation of laws in foreign countries."  RESTATEMENT OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES 3d § 441 (1987), reporters' notes 1.

The EU is a sovereign entity; it makes law and issues judgments to which Spain is subject.  Ordering Spain to comply with the Award would violate EU law in two ways:  *First*, *Achmea* holds that investment arbitration that may require the interpretation or application of EU law is incompatible with EU law.  Ordering Spain to comply with the Award would require Spain to recognize and validate an arbitration that contravenes EU law.  *Second*, the European Commission has instructed that the payment of any award arising out of an investment arbitration within the EU would constitute unlawful state aid.  Ordering Spain to pay a judgment resulting from the Award would require Spain to make unlawful payments in violation of EU law on state aid because the European Commission has not authorized its payment.

For purposes of this case, the Court is bound by the EU Court of Justice decision and the pronouncements of the European Commission.  The acts of foreign sovereigns become "a

principle of decision binding on federal and state courts alike." *W.S. Kirkpatrick & Co., Inc. v. Envt'l Tectonics Corp., Int'l*, 493 U.S. 400, 406 (1990). This is not a "vague doctrine of abstention." *Id.* The court may not "question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts." *Republic of Austria v. Altmann*, 541 U.S. 677, 713 (2004). The Petition must therefore be dismissed under Federal Rule of Civil Procedure 12(b)(6).

## III. THE AWARD IS NOT ENTITLED TO FULL FAITH AND CREDIT.

Under the statute implementing the ICSID Convention, the Award only receives "the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a); *Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1103 n.14 (D.C. Cir. 1982). But not all state-court judgments are enforceable. "[B]asic limitations on the full-faith-and-credit principle" require that "'the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment.'" *Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 704 (1982) (quoting *Durfee v. Duke*, 375 U.S. 106, 110 (1963)). Thus, "where the rendering forum lacked jurisdiction over the subject matter or the parties, full faith and credit is not required." *Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 386 (1996).

As discussed above, the Tribunal lacked jurisdiction in two ways. *First*, there was no valid agreement to arbitrate. "[T]he first principle that underscores all of [the Supreme Court's] arbitration decisions" is that "[a]rbitration is strictly a matter of consent." *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 299 (2010) (collecting authority for this "foundational" principle). Absent agreement and consent of the parties, the Tribunal is powerless and without jurisdiction; its members are only three jurists expressing an unenforceable opinion on a dispute.

25

*Second*, the Tribunal's award of unlawful state aid exceeded its authority.  "[A]rbitrators wield only the authority they are given."  *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407 (2019).  "[T]hey derive their powers" from the particular terms of the parties' agreement.  *Id.*; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010).  The Tribunal's jurisdictional mandate here was limited to "decid[ing] the issues in dispute in accordance with [the ECT] and applicable rules and principles of international law."  ECT, Art. 26(6).  As explained above and recognized by the Tribunal in its Award, EU law forms part of those "applicable rules and principles of international law," thereby excluding from the Tribunal's jurisdiction matters that may not be decided by arbitration under EU law.  Under EU law, the authorization of state aid is the exclusive province of the European Commission.  *See* TFEU, Arts. 107(1), 108(3).  Arbitral tribunals may not award state aid.  *Id.* at Arts. 108(2)–(3); State Aid Decision 2017/7384 ¶¶ 165, 166 (noting that this "[d]ecision is part of Union law, and as such also binding on Arbitration Tribunals, where they apply Union law.").  By trespassing on the European Commission's exclusive jurisdiction, the Tribunal rendered an *ultra vires* award that exceeds any jurisdiction it could have under Article 26 of the ECT.  The Award is therefore not entitled to full faith and credit.

## IV.     IN THE ALTERNATIVE, THE PETITION SHOULD BE DISMISSED UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*.

The legal arguments above are dispositive of this case.  Settled EU law demands that this Court dismiss the Petition.  But if there were any question about EU law and its application to this case, then the Court should dismiss under the doctrine of *forum non conveniens*.[10]

---

[10]  The Court may dismiss under *forum non conveniens* without first resolving questions of its jurisdiction.  *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007).

Courts may dismiss an action where "(1) there is an available and adequate alternative forum, and (2) the balance of various public and private interest factors indicates that maintaining the case in the current forum is comparatively inconvenient." *In re Air Crash Over Southern Indian Ocean*, 352 F. Supp. 3d 19, 35 (D.D.C. 2018) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  Both elements are readily established in this case.

*First*, the judicial system of the European Union provides adequate fora.  A "foreign forum is available and adequate when it provides the plaintiff with some remedy, even if the damages available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not recognized." *In re Air Crash*, 352 F. Supp. 3d at 36 (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247, 255 (1981)).  Under the ICSID Convention, a claimant can seek enforcement of a valid award in any contracting state (subject to available defenses, *see* Part IV *supra*).  Petitioners cannot dispute that Spain, Luxembourg, and the United Kingdom are available fora (among others).  If the Award were enforceable, the ordinary place to find Spanish assets is in Spain.  *See Figueiredo Ferraz E Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 391 (2d Cir. 2011) ("Where adequacy of an alternative forum is assessed in the context of a suit to obtain a judgment and ultimately execution on a defendant's assets, the adequacy of the alternate forum depends on whether there are some assets of the defendant in the alternate forum, not whether the precise asset located here can be executed upon there.").

*Second*, the *Gulf Oil* factors favor dismissal.  "The public interest factors to consider are the desirability of clearing foreign controversies from congested dockets, the extent of any local interest in resolving the controversy, and the ease with which the present forum will be able to apply the laws of an unfamiliar jurisdiction." *Atl. Tele-Network, Inc. v. Inter-Am. Dev. Bank*,

251 F. Supp. 2d 126, 137 (D.D.C. 2003). This District has ten pending actions against Spain alone, all of which involve the enforcement of international arbitral awards. Another twenty-seven arbitrations are pending before ICSID tribunals,[11] cases which will surely find their way to this District if it offers a divergent—and more favorable—interpretation of EU law.[12] The United States has no interest in resolving matters of EU law, particularly as applied to a treaty to which the United States is not a party.

Indeed, Petitioners have flocked to this District in hopes of evading the straightforward application of EU law. If they prevail, they will create a conflict between the U.S. courts and the EU Court of Justice on matters of EU law. That is precisely the kind of conflict that principles of international comity instruct courts to avoid. *Nygard v. DiPaolo*, 753 F. App'x 716, 728 (11th Cir. 2018) ("[T]he possibility of inconsistent rulings with foreign countries raises international comity concerns that should be considered in the forum non conveniens analysis."). Petitioners' choice of forum is entitled to little deference when the dispute has no connection to the forum. *Friends of All Children, Inc. v. Lockheed Aircraft Corp.*, 717 F.2d 602, 605 (D.C. Cir. 1983); *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 33 (D.D.C. 2006). Petitioners' choice of forum should be viewed with even more skepticism when it is predicated on a patent interest in avoiding the application of foreign law in the proper forum. *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 73 (2d Cir. 2001) ("the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference [it] commands").

---

[11] *See* ICSID Case Database, *available at* https://icsid.worldbank.org/en/Pages/cases/Advanced Search.aspx

[12] *See, e.g.*, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, 397 F. Supp. 3d 34, 36 (D.D.C. 2019) (expressing reservations in "resolving a thorny dispute over the implications of multiple treaty obligations and a shifting legal landscape in the European Union" and noting that "considerations of comity are particularly resonant here, given that resolving this case mandates addressing a conflict between decades-old treaties and newly minted EU case law").

Consistent with that view, other courts have dismissed actions against foreign sovereigns under the doctrine.  *See In Re Monegasque de Réassurance S.A.M. (Monde Re) v. Nak Naftogax of Ukraine*, 311 F.3d 488 (2d Cir. 2002) (affirming the district court's dismissal of an enforcement action against a Ukrainian state-owned company for *forum non conveniens* where the litigation had no connection to the United States); *Figueiredo Ferraz e Enghenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384 (2d Cir. 2011) (reversing the district court and ordering dismissal for *forum non conveniens* of an enforcement action where a Peruvian judgment-cap statute had a direct impact on Peru's ability to pay an arbitral award).

The D.C. Circuit imposes one limited restriction on the *forum non conveniens* doctrine in the context of the FSIA, which does not apply to the circumstances here.  In *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005), the petitioner sought to render an arbitral award into a domestic judgment in order to attach property that Ukraine's instrumentality in the United States.  *Id.* at 303.  The court held that dismissal under *forum non conveniens* was improper because a "court of the United States" is the only available forum for an action to "attach the commercial property of a foreign nation located in the United States[.]"  *Id.*[13]

This case presents a different issue.  *TMR Energy* addressed a later stage of the enforcement proceedings, where the live issue was which fora were available for attached commercial assets within the United States.  That only occurs after the court's jurisdiction had been established—notably, the respondent in that case ***did*** "***not dispute*** that [the] case [came] within . . . the exception to immunity for any action brought to confirm an arbitration award"

---

[13]  *See also BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016) ("In *TMR* we held that the doctrine of *forum non conveniens* does not apply to actions in the United States to enforce arbitral awards against foreign nations."); *Newco Ltd. v. Gov't of Belize*, 650 F. App'x 14, 16 (D.C. Cir. 2016).

under Section 1605(a)(6) of the FSIA. *TMR Energy*, 411 F.3d at 324 (emphasis added). By contrast, Spain vigorously contests the Court's jurisdiction. The Court's jurisdiction must be resolved as a threshold matter—and thus well before the issue of attachment and enforcement in *TMR Energy* become relevant. The District of Columbia is an inconvenient forum to resolve the predicate question to attachment: whether Petitioners can establish a valid arbitration agreement to deprive Spain of its sovereign immunity. Resolution of that question is not proper in this forum because of the complicated issues of European Union and international law, none of which was present in *TMR Energy*. At a theoretical later stage, Spain agrees the United States is the only jurisdiction in which to execute a judgment against assets in the United States.[14]

Any broader reading of *TMR Energy* would render *forum non conveniens* functionally inapplicable to any case that falls under the enforcement provisions of the FSIA. But that cannot be the case. As the D.C. Circuit explains: "the doctrine of *forum non conveniens* remains fully applicable in FSIA cases." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002); *Simon v. Republic of Hungary*, 911 F.3d 1172, 1182 (D.C. Cir. 2018).

## V.      IN THE ALTERNATIVE, THE CASE SHOULD BE STAYED PENDING RESOLUTION OF THE ANNULMENT PROCEEDINGS.

In all events, the Court should not grant the Petition until Spain's application for annulment is resolved. The Court may issue a stay under its inherent authority to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936). In considering a motion to

---

[14] Spain notes, however, that the location of such assets does not make the United States the *only* available forum for Petitioners' enforcement action. "[I]t is well established that the availability and the adequacy of a forum does not turn on whether exactly the same remedy that exists in the United States is available in the foreign forum." *Southern Indian Ocean*, 352 F. Supp. 3d at 38. A foreign forum need only provide the petitioner "with *some* remedy, even if the damages available to the plaintiff would be less than those available in the United States, and even if certain theories of liability are not recognized." *Id.* at 37.

stay, the Court should "weigh competing interests and maintain an even balance between the court's interests in judicial economy and any possible hardship to the parties." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732-33 (D.C. Cir. 2012) (internal quotation marks omitted). All factors support a stay in this case.

*First*, the Award itself is currently stayed under the ICSID Convention. Spain filed for annulment under Article 52 of the Convention on April 8, 2020 and requested a provisional stay of enforcement. Enforcement of the Award is automatically stayed under the ICSID Convention until an *ad hoc* Committee is fully constituted and able to rule on the duration of an ongoing stay. ICSID Convention, Art. 52(5). The prevailing practice of such Committees is to stay enforcement until the annulment process is resolved. *Second*, the *ad hoc* Committee is empowered to annul the entirety of the Award, and Spain has requested that relief. ICSID Convention, Art. 52(3). The Court should not enforce an award when challenges to its validity have not yet been resolved. *Third*, a stay prevents duplicative litigation in multiple fora and avoids the possibility of conflicting results between this Court's determination and the *ad hoc* Committee's annulment decision. *Fourth*, the balance of hardships also weighs in favor of a stay. No injury will result to Petitioners; in the event the Award were eventually enforced, Petitioners will have continued to accrue interest on the Award through the date of payment. Award ¶ 80(d). Denying a stay and granting the Petition, by contrast, would compel Spain to violate EU law.

Several other petitioners have initiated actions in this District, seeking to enforce arbitral awards issued under the ECT against the Kingdom of Spain. None of the judges has granted the petitions. Every court to enter an order has instead stayed the action pending resolution of the parallel annulment proceedings. *See Infrastructure Servs. Luxembourg S.a.r.l. et al. v. Kingdom*

*of Spain*, Civ. No. 18-1753 (EGS), ECF No. 36 (Aug. 28, 2019) (staying the proceedings and ordering the parties to provide periodic updates to the court); *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, Civ. No. 18-2254 (JEB), ECF No. 29 (Sept. 18, 2019) (same); *Novenergia II – Energy & Environment (SCA) v. Kingdom of Spain*, Civ. No. 18-1148 (TSC), ECF No. 43 at 1 (Jan. 27, 2020) (same); *Eiser Infrastructure Limited et al. v. Kingdom of Spain*, Civ. No. 18-1686 (CKK), ECF No. 51 (Feb. 13, 2020) (same).

## CONCLUSION

For these reasons, Spain respectfully requests the Court enter an order dismissing the Petition for lack of subject-matter jurisdiction; dismissing the Petition under the doctrine of *forum non conveniens*; denying the Petition on the merits under either the foreign sovereign compulsion doctrine or the full-faith-and-credit requirement; or, at a minimum, staying the proceedings until Spain's application for annulment is resolved.

Respectfully submitted,

  */s/ Ana C. Reyes*

Ana C. Reyes (D.C. Bar No. 477354)
Jonathan M. Landy (D.C. Bar No. 467847)
Benjamin W. Graham (D.C. Bar No. 1044724)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
Tel.:     (202) 434-5000
Fax:     (202) 434-5029
Email:    areyes@wc.com

Csaba M. Rusznak (D.C. Bar No. 1030310)
SOVEREIGN ARBITRATION ADVISORS LLC
1050 Connecticut Avenue, N.W., Ste. 66255
Washington, DC  20035
crusznak@sovereignarbitration.us

*Counsel for the Kingdom of Spain*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2020, I caused the foregoing to be filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered participants.

_/s/ Benjamin W. Graham_
Benjamin W. Graham