IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.A.R.L., | |
| *Petitioners*, | Civil Action No. 1:19-cv-03783-CJN |
| v. | |
| Kingdom of Spain, | |
| *Respondent*. | |

**RREEF's Supplemental Brief in Response to the
European Commission's *Amicus* Brief in Support of the
<u>Kingdom of Spain's Motion to Dismiss the Petition or Stay the Proceeding</u>**

## TABLE OF CONTENTS

**Page**

**Contents**

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 2

    I.   The Commission's *Amicus* Brief Does Not Impact This Case ..................................... 2

    II.  The ECT Expressly Authorizes Intra-EU Arbitration .................................................. 3

    III.  The EU Treaties Do Not Prevent Intra-EU Arbitration Under The ECT ..................... 8

        A.   Intra-EU Arbitration Under The ECT Is Compatible With *Achmea* ................... 8

        B.   Intra-EU Arbitration Does Not Threaten EU State Aid Law ............................ 10

        C.   The ECT's Arbitration Provision Is Enforceable Under International Law Regardless Of Whether It Complies With EU Law............................................ 12

    IV.  International Comity Cannot Override Congress's Mandate To Enforce The Award .......................................................................................................................... 14

CONCLUSION .................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*,
    138 S. Ct. 1865 (2018) ..................................................................................................3

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204 (1988) ......................................................................................................3

*Chevron Corp. v. Republic of Ecuador*,
    795 F.3d 200 (D.C. Cir. 2015) ......................................................................................2

*Choctaw Nation of Indians v. United States*,
    318 U.S. 423 (1943) ......................................................................................................6

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) ......................................................................................................7

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
    731 F.2d 909 (D.C. Cir. 1984) ....................................................................................15

*In re Maxwell Commc'n Corp.plc by Homan*,
    93 F.3d 1036, 1047 (2d Cir. 1996) ..............................................................................14

*Newco Ltd. v. Gov't of Belize*,
    650 F. App'x 14 (D.C. Cir. 2016) ...............................................................................15

*Philipp v. Fed. Republic of Germany*,
    894 F.3d 406 (D.C. Cir. 2018) ....................................................................................15

*PPL Corp. v. Comm'r*,
    569 U.S. 329 (2013) ......................................................................................................2

*Republic of Argentina v. NML Capital, Ltd.*,
    573 U.S. 134 (2014) ....................................................................................................15

*Romero v. Int'l Terminal Operating Co.*,
    358 U.S. 354 (1959) ....................................................................................................14

*United States v. Ali*,
    718 F.3d 929 (D.C. Cir. 2013) ......................................................................................6

**Foreign Judicial Decisions**

*Commission v. Ireland*,
    ECLI:EU:C:2006:345 (May 30, 2006) ..........................................................................9

# TABLE OF AUTHORITIES (*continued*)

**Page(s)**

*Foto-Frost v. Hauptzollamt Lübeck-ost*,
  Case 314/85, EU:C:1987:452 (Oct. 22, 1987) .........................................................9

*Matthews v. United Kingdom*,
  28 EHRR 361 (1999) .............................................................................................12

*Slovak Republic v. Achmea BV*,
  ECLI:EU:C:2018:158 (Mar. 6, 2018) .....................................................................8

**Arbitration Decisions**

*Electrabel S.A. v. Hungary*,
  ICSID Case No. ARB/07/19, Award (Nov. 25, 2015) ...........................................13

**Statutes**

22 U.S.C. § 1650a ...............................................................................................1, 2, 14

**Treaties**

Comprehensive Economic and Trade Agreement between Canada and the EU,
  art. 8.31 ................................................................................................................10

Energy Charter Treaty, art. 1 .................................................................................4, 5

Energy Charter Treaty, art. 2 ....................................................................................7

Energy Charter Treaty, art. 10 .................................................................................11

Energy Charter Treaty, art. 26 ...................................................................3, 5, 7, 10

Energy Charter Treaty, art. 36 ...................................................................................5

Energy Charter Treaty, art. 46 ...................................................................................8

ICSID Convention, art. 53 .................................................................................12, 15

ICSID Convention, art. 54 ........................................................................................15

Treaty on the Functioning of the European Union, art. 107 .....................................11

Treaty on the Functioning of the European Union, art. 108 .....................................11

Treaty on the Functioning of the European Union, art. 351 .....................................13

## TABLE OF AUTHORITIES (*continued*)

**Page(s)**

Vienna Convention, art. 31 ..................................................................................6

Vienna Convention, art. 32 ..................................................................................6

### Other Authorities

Marise Cremona, *Disconnection Clauses in EU Law & Practice*, in Mixed
Agreements Revisited: The EU and its Member States in the World 160
(Hillion & Koutrakos eds., 2010) ..........................................................................8

Opinion of Advocate General Bot, Court of Justice, Opinion 1/17, Request for an
opinion by the Kingdom of Belgium, ECLI:EU:C:2019:72
(Jan. 29, 2019)....................................................................................................10

Opinion of Advocate General Saugmandsgaard Øe, *Anie v. Ministero dello
Sviluppo Economico, Gestore dei servizi energetici (GSE) SpA*, Case Nos. C-
798/18, C-799/18, ECLI:EU:C:2020:876 (Oct. 29, 2020)........................................5

Opinion of Advocate General Wathelet, *Slovak Republic v. Achmea BV*, Case C-
284/16, ECLI:EU:C:2017:699 (Sept. 19, 2017) .......................................................5

Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report
on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B.
Int'l L. EC 220 ......................................................................................................6

Statement Submitted by the European Communities to the Secretariat of the ECT
Pursuant to Art. 26(3)(b)(ii) of the ECT, [1998] O.J. L69/115 .................................4

U.N. General Assembly, Report of the Study Group of the Int'l Law EC,
*Fragmentation of International Law: Difficulties Arising from the
Diversification and Expansion of International Law*, UN Doc No.
A/CN.4/L.682 (2006)............................................................................................13

## GLOSSARY

**CETA** ..........................................................Comprehensive Economic and Trade Agreement between Canada of the One Part, and the EU and Its Member States, of the Other Part

**CJEU** ...........................................................Court of Justice of the European Union

**ECT** .............................................................Energy Charter Treaty

**EU** ...............................................................European Union

**FSIA** ...........................................................Foreign Sovereign Immunities Act

**ICSID Convention**.......................................Convention on the Settlement of Investment Disputes between States and Nationals of Other States

**REIO** ...........................................................Regional Economic Integration Organisation

**TFEU**...........................................................Treaty on the Functioning of the European Union

## INTRODUCTION

RREEF brought this proceeding against Spain to confirm an arbitral award, ECF No. 1-1, Ex. A (the "Award"), entered pursuant to the Energy Charter Treaty, ECF No. 1-3 (the "ECT"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, ECF No. 1-2 (the "ICSID Convention").  Although Congress enacted a streamlined process for confirming ICSID awards without any substantive defenses, 22 U.S.C. § 1650a, this action has now generated 120 pages of briefs by the parties and 5 expert declarations on issues of European Union ("EU") and international law that, as RREEF has shown, have no bearing on RREEF's express statutory right to enforce the Award, ECF No. 17 ("RREEF Br."), at 10-19.

On top of this mountain of largely irrelevant paper, the European Commission—the executive arm of the EU, of which Spain is a member—offers an *amicus* brief supporting Spain's claim that its consent to arbitrate in the ECT was inconsistent with EU law and thus unenforceable under international law.  ECF No. 25-1 ("EC Br.").  The Court need not consider this new brief because the issues it raises could be relevant only if § 1650a permitted substantive defenses to enforcement. It does not.  Further, the Commission's brief cannot revive arguments that Spain itself forfeited by not raising them here and conceding in the arbitration that its EU-law objections did not apply to Jersey—RREEF Infrastructure's home.  And as an executive body, the Commission speaks with no special authority on EU law, let alone international law.  Its views warrant no special solicitude.

In any event, the Commission's arguments are meritless.  They merely reflect the Commission's renewed effort to obtain through litigation what it failed to obtain in negotiating the ECT:  a "disconnection clause" that precludes investors from one EU member from enforcing the treaty against another member ("intra-EU arbitration").  The ECT expressly provides otherwise, and its drafters decidedly rejected that position.  The EU itself and all its members signed the ECT anyway.  For more than a decade, the Commission has nonetheless tried to convince arbitration

tribunals to read intra-EU arbitration out of the ECT based on either a flawed reading of the treaty or an illusory conflict with EU law. *Every* tribunal to consider this issue has rejected the Commission's arguments. Should the Court reach these issues presented, it should do the same here.

## ARGUMENT

### I.     The Commission's *Amicus* Brief Does Not Impact This Case

This Court need not reach the Commission's arguments for at least three reasons.

*First*, as RREEF has explained, U.S. law does not permit any defense to enforcing an IC-SID award. RREEF Br. 8-10. Congress mandated that once jurisdiction is established, the Award must be "enforced" and "given the same full faith and credit" as a state court judgment. 22 U.S.C. § 1650a. The Foreign Sovereign Immunities Act ("FSIA") confers that jurisdiction without regard to any challenge to the Tribunal's conclusion that Spain agreed to arbitration. RREEF Br. 10-20. The Commission does not dispute this, or even cite the FSIA, the ICSID Convention, or § 1650a.

*Second*, several of the Commission's arguments—including those addressing the interpretation of the ECT, arbitration's effect on state aid law, and international comity—are not properly before this Court because Spain never raised them, *see infra* at 3-8, 10-12, 14-15, and thus forfeited them, *see PPL Corp. v. Comm'r*, 569 U.S. 329, 343 n.6 (2013) (refusing to consider argument first raised by *amicus*). The Commission's main arguments—regarding intra-EU arbitration—are especially misplaced because Spain **conceded** in the arbitration they **do not apply to RREEF Infra-structure** given that it is incorporated in Jersey, which is not part of the EU. *See* ECF No. 1-1, Ex. B ("Jx. Dec.") ¶ 37. Further, once RREEF met its "initial burden" of showing that Spain agreed to arbitrate under the ECT, it was Spain's burden to prove that no "valid arbitration agreement" existed. *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 204-05 (D.C. Cir. 2015); RREEF Br. 18-19. The Commission's new arguments cannot cure Spain's failure to meet that burden.

*Third*, while the Commission purports to represent the EU's "official position," EC Br. 1,

it does not speak authoritatively on EU law, *see* Second Decl. of Sir Alan Dashwood ("Dashwood Decl. II") ¶¶ 12-17, filed herewith.  As an executive body, not a court, the Commission's views of EU law—much less its "litigating positions" as an *amicus*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)—lack "conclusive effect," *Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869 (2018).  Nor is the Commission's authority bolstered by the EU Council decision to approve the filing of its brief.  EC Br. 1.  The Council is a quasi-legislative, quasi-executive body, Dashwood Decl. II ¶ 12, and in approving the Commission's brief, it acts only in a "[n]on-legislative" (*i.e.*, executive) capacity, *e.g.*, EU Council (Foreign Affairs), List of "A" Items, at 1-2 (Feb. 15, 2019), tiny.cc/u8r54y.  The Council thus speaks with no more authority than the Commission.  Its approval of the Commission's brief was not unanimous.  Dashwood Decl. II ¶ 14.  And even the most authoritative statement of the EU's views would not control interpretation of the ECT or its effect under international law.  EC Br. 11-14, 19-23.  Only collective action by all parties to a treaty can modify its plain meaning and effect.  RREEF Br. 25.

## II.    The ECT Expressly Authorizes Intra-EU Arbitration

The Commission first argues (at 11-14) that by its terms, the ECT does not authorize "intra-EU" arbitration between an EU member and another member's investors.  Spain made the same argument in the arbitration, and the Tribunal rejected it in a binding ruling, Jx. Dec. ¶¶ 35, 38, 88, because the treaty expressly covers disputes "between a Contracting Party [Spain] and an Investor [RREEF] of another Contracting Party," ECT, art. 26(1)—*i.e.*, Luxembourg and Jersey, to which the UK has extended the ECT, RREEF Br. 4 & n.2.  Spain has not challenged that ruling here, so this argument is forfeited.  Regardless, the Commission's strained reading cannot be squared with the ECT's text and history.  *See* Second Decl. of Andrea K. Bjorklund ("Bjorklund Decl. II") ¶¶ 9-46, filed herewith; Dashwood Decl. II ¶¶ 18-41.  Every arbitral tribunal to consider it has rejected it.  Bjorklund Decl. II ¶ 13 & n.7.  Should this Court reach the issue, it should do the same.

**A.**      The Commission's main premise is that the ECT should be interpreted as treating the EU and all its members collectively as the "same Contracting Party."  EC Br. 13.  But the operative provision—defining "Contracting Party"—refutes that premise.  Any "state . . . bound by th[e] Treaty" is a separate "Contracting Party."  ECT, art. 1(2).  Each EU state was separately represented in negotiating the treaty and signed the treaty separately in its own name.  Dashwood Decl. II ¶¶ 23-32.  The ECT thus stands in contrast to the treaty at issue in the Advocate General Bot opinion that the Commission cites at 13—the Comprehensive Economic and Trade Agreement Between Canada, of the One Part, and the EU and Its Member States, of the Other Part ("CETA"), Oct. 30, 2016, tiny.cc/itvz4y.  That treaty's very title, and its definition of "Parties," show that "the [EU] or its Member States" or both are one of two "Parties" that can arbitrate against each other but not among themselves, *id.*, art. 1.1.  There is no equivalent language in the ECT.  *See* Bjorklund Decl. II ¶¶ 20-21; Dashwood Decl. II ¶ 36 & n.47.  Instead, each "state" is a "Contracting Party": Spain is one, Luxembourg is "another," and so is Jersey through the UK.

To be sure, a "Regional Economic Integration Organisation" ("REIO") like the EU may join the ECT as an additional "Contracting Party."  ECT, art. 1(2).  But that means only that it takes on its own duties under the treaty.  The ECT contemplates that a REIO may exercise "competence over . . . matters . . . governed by th[e] Treaty," *id.*, art. 1(3), so by acceding to the treaty, it may bind itself in exercising that competence.  But the REIO's members remain bound by their own commitments, too, and where appropriate, investors may "initiate proceedings against both the [EU] and [its] [m]ember[s]," as the EU's signing statement confirms.  Statement Submitted by the European Communities to the Secretariat of the ECT Pursuant to Art. 26(3)(b)(ii) of the ECT, [1998] O.J. L69/115, n.1, tiny.cc/vq994y ("Signing Statement").

Rather than confronting the operative treaty terms, the Commission relies mainly on strained inferences from inapposite provisions.  EC Br. 7-8, 11.  Article 36(7), for example, gives

the EU and its members the choice, in treaty governance matters, either to have each member vote separately or to have the EU vote collectively.  ECT, art. 36(7).  Far from merging all EU members into a single, indivisible Contracting Party, as the Commission infers, the article preserves their option to act individually, and refers to them as separate "Contracting Parties," plural.  *Id*.; Dashwood Decl. II ¶ 31.  Likewise, while the ECT's definition of an REIO contemplates that REIOs might make decisions "binding on" their members in unspecified circumstances, it does not say that REIO members lose their status as distinct Contracting Parties with distinct treaty rights and duties.  ECT, art. 1(3); *see also* Bjorklund Decl. II ¶¶ 14-15; Dashwood Decl. II ¶¶ 29-30.

The Commission also argues that intra-EU arbitration is unavailable because the ECT treats companies like RREEF as "'Investors'. . . of the EU," EC Br. 12, not their home states.  But this once again ignores the ECT's definition of the critical term: An "Investor" of a Contracting Party is one "organized in accordance with [its] law."  ECT, art. 1(7)(a)(ii); Dashwood Decl. II ¶¶ 36-37.  Petitioners were incorporated under local laws of Luxembourg and Jersey alone, so they are investors of those countries.[1]  The ECT's plain text thus provides for arbitration here.[2]

---

[1]     Treating all EU-based companies as Investors of the EU rather than their member countries would have unintended consequences beyond intra-EU disputes:  The ECT allows arbitration to proceed under the ICSID Convention only if the "Contracting Party of the Investor" is a party to that Convention, ECT, art. 26(4)(a)(i), but the EU itself cannot become a party to that Convention, *see* Signing Statement.  Treating EU-based companies as "Investors of the EU" rather than their home countries would thus bar them from invoking ICSID arbitration—one of the core benefits of the ECT—against any country, EU or otherwise.

[2]     The Commission's interpretation finds no support in the Opinion of Advocate General Saugmandsgaard Øe, *Anie v. Ministero dello Sviluppo Economico, Gestore dei servizi energetici (GSE) SpA*, Case Nos. C-798/18, C-799/18, ECLI:EU:C:2020:876 (Oct. 29, 2020), tiny.cc/vyg8tz.  The issue was whether the ECT applies to disputes "between investors and their own Member State."  *Id*. ¶ 93.  The Advocate General expressly found it "not necessary to examine" the ECT's application to disputes against other EU members.  *Id*.  The opinion's passing discussion of that issue in *dicta* rests on the same flawed argument about REIOs as the Commission.  *Id* ¶ 92 n.53.  And other Advocates General agree with RREEF that the ECT does apply "between [EU] Member States."  Opinion of Advocate General Wathelet, *Slovak Republic v. Achmea BV*, Case C-284/16, ECLI:EU:C:2017:699, ¶ 43 (Sept. 19, 2017), tiny.cc/6mkirz; Dashwood Decl. II ¶¶ 23-24.

**B.**      Lacking textual support, the Commission tries to minimize the importance of the treaty's text by casting interpretation as a "'combined operation' without any hierarchy."  EC Br. 11.  But its own authorities confirm that the "the starting point of interpretation is the elucidation of the meaning of the text."  Sir Humphrey Waldock (Special Rapporteur on the Law of Treaties), *Sixth Report on the Law of Treaties*, UN Doc. A/CN.4/186 and Add.1-7, [1966] 2 Y.B. Int'l L. EC 220 ("Waldock Report").  "Basic principles of treaty interpretation—both domestic and international—direct courts to construe treaties based on their text before resorting to extraneous materials."  *United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013).  As a result, "treaties cannot be rewritten or expanded beyond their clear terms," even "to achieve the asserted understanding of the parties."  *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432 (1943).

The Commission agrees that the ECT must be interpreted pursuant to the Vienna Convention, ECF No. 17-3.  *See* EC Br. 11.  The Convention adopts a "textual approach" to "treaty interpretation," Waldock Report, at 220, but also requires consideration of certain specified "context," including the treaty's "preamble" and "annexes," and interpretations agreed to or accepted by "*all* the parties," Vienna Convention, art. 31(2), (2)(a) (emphasis added).  Unilateral interpretations by "one or more parties," by contrast, are not relevant unless "accepted by the other parties."  *Id.*, art. 31(2)(b).  And other sources—such as the "preparatory work of the treaty and the circumstances of its conclusion"—cannot even be considered unless the text "[l]eaves the meaning ambiguous or obscure" or "[l]eads to a result which is manifestly absurd or unreasonable."  *Id.*, art. 32.

There is thus no room for this Court to consider the Commission's unilateral account of the ECT's "historical context."  EC Br. 5-9, 11-12.  The Commission claims the ECT was the EU's own "brainchild" and was intended solely to permit "cooperation between the EU . . . and . . . former communist countries."  *Id.* at 5-6.  But it cites no authority, and its own say-so is no basis to narrow the treaty's scope considerably.  As actually drafted, the treaty reaches much farther than

in the Commission's account:  Its stated goal is "to promote long-term cooperation in the energy field" generally, not just between specific Contracting Parties.  ECT, art. 2; *see also* ECF No. 20 ("Bjorklund Decl. I") ¶¶ 42-45; Bjorklund Decl. II ¶¶ 39-46; Dashwood Decl. II ¶¶ 20-22.

Far from supporting the Commission's narrow reading, the ECT's history firmly undermines it.  The ECT's drafters explicitly rejected the Commission's proposal to include a "disconnection clause" in the treaty that would have exempted intra-EU disputes from the ECT's scope.  RREEF Br. 27; *see also* Bjorklund Decl. II ¶¶ 28-35; Dashwood Decl. II ¶¶ 18, 38-40.  The EU has used similar disconnection clauses in at least 17 other multilateral agreements to preclude their application between members, RREEF Br. 27, yet the Commission failed to persuade other drafters to include such a clause in the ECT, and the Commission still signed the treaty anyway.  As the Tribunal concluded, it is simply implausible that the ECT's drafters meant to include such a sweeping implied exclusion of intra-EU disputes—going to the "essence of [the] treaty"—yet failed to make any "formal warning" to that effect through the ordinary mechanisms available to treaty makers for doing so.  Jx. Dec. ¶¶ 84-85.  Treaty drafters, much like Congress, do not "'hide elephants in mouseholes.'"  *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 528 (2014).[3]

Nor can the Commission claim that it modified the treaty's plain language by submitting a "declaration" pursuant to Article 26(3)(b) of the ECT.  EC Br. 12.  The Article—and the Commission's statement—concern only the *resubmission* to arbitration of a dispute "previously submitted" to a Contracting Party's domestic courts.  ECT, art. 26(3)(b)(i); Dashwood Decl. II ¶¶ 33-35.  The ECT otherwise prohibits Contracting Party's from modifying the treaty's effect through written

---

[3]     The Commission claims a disconnection clause was not needed in the treaties that formed the World Trade Organization ("WTO"), EC Br. 14, but that is because the WTO was built on a prior treaty—the General Agreement on Tariffs and Trade ("GATT")—that treated the EU and its members as a single block (a "customs union").  Bjorklund Decl. II ¶¶ 30-32.  By contrast, the Commission obviously believed a disconnection clause would have been needed to preclude intra-EU arbitration under the ECT, because it *attempted* to include one, and was rebuffed.

"reservations" of their rights.  ECT, art. 46; Jx. Dec. ¶ 85; Bjorklund Decl. I ¶ 112.  There is thus no basis to read into the ECT the disconnection clause that the Commission failed to achieve through negotiation.[4]

## III.   The EU Treaties Do Not Prevent Intra-EU Arbitration Under The ECT

Unable to deny the ECT's plain terms, the Commission seeks to avoid them by arguing that EU law precludes the ECT's application to intra-EU disputes.  Accepting that argument would effectively read into the ECT the same disconnection clause that the ECT's drafters expressly rejected, leaving the EU with the benefit of participating in the treaty without the duties the drafters demanded.  As RREEF has explained, that argument fails under both EU and international law.

### A.    Intra-EU Arbitration Under The ECT Is Compatible With *Achmea*

The Commission's main EU-law argument largely tracks Spain's, and fails for the same reason.  RREEF Br. 20-34.  Like Spain, the Commission characterizes the decision of the EU Court of Justice ("CJEU") in Case C-284/16, *Slovak Republic v. Achmea BV*, ECLI:EU:C:2018:158 (Mar. 6, 2018) ("*Achmea*"), ECF No. 16-7, as holding that Articles 267 and 344 of the Treaty on the Functioning of the European Union ("TFEU"), ECF No. 16-12, "prohibi[t] [EU] Member[s] . . . from offering to resolve intra-EU investor-State disputes before arbitral tribunals," EC Br. 10. *Achmea*'s holding, however, is limited to bilateral treaties like the one at issue in that case.  RREEF Br. 28-33; Dashwood Decl. II ¶¶ 42-74.  The CJEU expressly distinguished multilateral treaties

---

[4]    The Commission's regular use of disconnection clauses and its attempt to add one to the ECT belies its argument (at 13-14) that such clauses have no legal effect.  Indeed, the Commission's own authority recognizes that even where such clauses are not needed under EU law, they may be necessary to "bring . . . [EU] law into line with . . . international law."  Marise Cremona, *Disconnection Clauses in EU Law & Practice*, in Mixed Agreements Revisited: The EU and its Member States in the World 160, 179 (Hillion & Koutrakos eds., 2010); ECF No. 20-18.  If the Commission's proposed disconnection clause were truly a nullity, the ECT's drafters would have had no reason to reject it.  Rejecting that proposal reflects a deliberate decision that the ECT should apply intra-EU to the same extent it applies to other nations.  *See* Dashwood Decl. II ¶ 38 n.50.

joined "by the EU" and all its members, like the ECT, because that type of coordinated action does not pose the same risk to "mutual trust" and "sincere cooperation" within the EU. *Achmea*, ¶ 58; Dashwood Decl. II ¶¶ 58-59.[5]  Unlike the treaty in *Achmea*, moreover, the ECT does not direct tribunals to apply EU law, so it does not implicate *Achmea*'s concern for the autonomy of the EU legal order.  RREEF Br. 30; Bjorklund Decl. II ¶¶ 47-54; Dashwood Decl. II ¶¶ 56-57.  And none of the concerns apply to Jersey-based investors like RREEF Infrastructure.  RREEF Br. 33-34.

Further, only the CJEU has power to declare acts of EU institutions (here, the ECT) invalid.  *Foto-Frost v. Hauptzollamt Lübeck-ost*, Case 314/85, EU:C:1987:452 (Oct. 22, 1987), tiny.cc/xec8tz.  Whatever implications the Commission may try to draw from *Achmea*, it is beyond dispute that the CJEU has never specifically addressed the validity of intra-EU arbitrations under the ECT.  Unless and until the CJEU rules otherwise, the ECT remains valid.  Dashwood Decl. II ¶ 64.[6]

The Commission's response shows the striking breadth of its theory.  In its view, all that mattered in *Achmea* was that arbitration could have led to "pronouncements on EU law" by a

---

[5]  The Commission claims (at 23) that in Case C-459/03, *Commission v. Ireland* ("*Mox Plant*"), ECLI:EU:C:2006:345 (May 30, 2006), the CJEU applied a similar principle to forbid intra-EU arbitration pursuant to a treaty signed by the EU itself.  But *Mox Plant* involved a dispute between EU "members states" as parties.  Unlike disputes with private investors, those disputes are directly within the CJEU's exclusive jurisdiction under Article 344 of the TFEU.  Dashwood Decl. II ¶¶ 70-71 & n.100.   The CJEU has no jurisdiction, let alone exclusive jurisdiction, to hear a dispute under the ECT, so *Mox Plant* is not applicable.  Further, the treaty there did not include any agreement to submit disputes (intra-EU or otherwise) to arbitration.  It merely allowed the parties to agree on dispute resolution methods between themselves—and the EU and its members expressly agreed in signing the treaty (as the treaty permitted, but the ECT does not) that the CJEU would resolve the type of treaty disputes at issue in that case.  Bjorklund Decl. II ¶¶ 60-61.  *Mox Plant* confirms that intra-EU application of multilateral treaties is to be negotiated with the EU in each treaty—not categorically forbidden.

[6]  Even if the CJEU were to extend *Achmea* to the ECT, it would give the decision only prospective effect.  RREEF Br. 31.  The Commission claims "one Member State" asked for "such a limitation" in *Achmea*, but it offers no evidence, EC Br. 18-19 n.22, and nothing in the *Achmea* opinion indicates that the CJEU considered or rejected such a request, Dashwood Decl. II ¶ 73.  In any event, extending *Achmea* to the ECT would present stronger grounds for purely prospective effect than in *Achmea* itself because it would upset settled expectations under a major multilateral treaty joined by 27 EU members, the EU itself, and 25 other states—not just a single bilateral treaty.

tribunal that is not "part of the EU judicial system." EC Br. 16. This possibility alone, the Commission claims, "threaten[s] the autonomy of the EU legal order and the principles of sincere cooperation and mutual trust between the EU and its [m]ember[s]," even when the EU and all of its members have authorized the arbitration. *Id.* But nothing about that broad reasoning distinguishes intra-EU arbitration from arbitration between EU members and other non-EU nations, like the EU's CETA agreement with Canada. Ignoring *Achmea*'s key limitations thus leaves the Commission without a reliable limiting principle. Dashwood Decl. II ¶ 57.

The Commission itself has acknowledged that *Achmea* does not sweep this broadly. In another context, it told the CJEU that the applicable law provision in CETA—substantially identical to the one in the ECT, *compare* CETA, art. 8.31(1), *with* ECT, art. 26(6)—is consistent with EU law because it does not authorize a CETA tribunal to "apply internal EU law, rather merely the provisions of the CETA," Opinion of Advocate General Bot, Court of Justice, Opinion 1/17, Request for an opinion by the Kingdom of Belgium, ECLI:EU:C:2019:72, ¶ 167 (Jan. 29, 2019), tiny.cc/e4h8tz ("Bot Opinion"); *see also* Bjorklund Decl. I ¶¶ 137-39. The CJEU agreed, holding that *Achmea*'s concerns are not implicated where EU law is relevant only as a matter of "fact"— the legal background against which a treaty was violated—so long as it does not supply the applicable law. *See* RREEF Br. 30-31 & n.15. And RREEF has already explained (*id.* at 32-33) why this analysis is not changed by the Commission's invocation (at 10-11) of the three January 2019 EU member state "declarations" expressing divergent views on intra-EU arbitration post-*Achmea*.

## B. Intra-EU Arbitration Does Not Threaten EU State Aid Law

The Commission also makes a second EU-law argument based on EU state aid law. Spain, too, invoked state aid, arguing that paying the Award—and any judgment enforcing it—would violate EU competition rules limiting members' authority to offer subsidies, or "state aid." ECF No. 16-1 ("Spain Br."), at 9-10. RREEF has already explained why these arguments are wrong

and irrelevant to this proceeding.  RREEF Br. 34-40.  But the Commission's state aid argument goes farther.  The Commission claims that enforcing the Award would undermine the EU's ability to regulate state aid.  Spain never made that argument, so it is forfeited.  It is also meritless.

EU state aid law protects competition within the EU by ensuring that member states' policies do not unfairly advantage certain entities or industries.  TFEU, art. 107(1); Decl. of Conor Quigley, ECF No. 18 ("Quigley Decl.") ¶ 48.  A measure that qualifies as state aid cannot go into effect before the Commission reviews it to determine whether the aid is "compatible" with the EU internal market.  Quigley Decl. ¶¶ 17-26; TFEU, art. 108(1), (2).

Nothing in the ECT prevents the Commission from carrying out this task.  Quigley Decl. ¶¶ 45-46.  The ECT protects investors by requiring Contracting Parties to treat them "fair[ly] and equitabl[y]."  ECT, art. 10(1).  In cases like this one, the treaty thus gives investors a remedy if they are lured by subsidies to invest in a country that then revokes the subsidies.  Award ¶¶ 325-30, 381, 386, 390, 399.  If the Commission believes the subsidy at issue is state aid that required the Commission's preapproval or is incompatible with the EU market, nothing in the ECT stops it from making that determination, asking the state to revoke the subsidy, and sanctioning the state for noncompliance.  TFEU, art. 108(2).  The ECT merely requires the state to *also* compensate the investor for its reliance on the state's misleading promises.  Far from offering states an end-run around EU state aid law, the ECT gives them an added incentive *not* to offer (and then revoke) unlawful state aid, lest they face *double* liability to investors *and* the Commission.

The Commission does not contend that the Tribunal made a determination of EU law as to whether any subsidy was state aid or compatible with the EU market.  The Tribunal never reached those questions.  Instead, it treated state aid law as irrelevant to whether Spain violated the ECT, Quigley Decl. ¶¶ 38-44.  There can be no claim, therefore, that the Tribunal interfered with the Commission's supposedly exclusive authority to decide issues of state aid.  While the Commission

11

may disagree with the Tribunal about the relevance of state aid law to the ECT, EC Br. 16-17, the

Tribunal's decision on that issue was "binding," ICSID Convention, art. 53(1), and well within its

power to decide which issues are relevant to the international law issues before it.

### C.   The ECT's Arbitration Provision Is Enforceable Under International Law Regardless Of Whether It Complies With EU Law

Even if the ECT's provision for intra-EU dispute resolution were inconsistent with EU law,

that would not invalidate the provision under international law, which governs the ECT.   RREEF

Br. 22-28.   The Commission accepts that any purported conflict between competing treaties—

here, the ECT and the TFEU—must be resolved based on "customary international law" principles

governing "resolution of those conflicts," including the Vienna Convention.  EC Br. 19.  Yet de-

spite that concession, the Commission relies almost entirely on *EU* authority addressing *EU* law.

The main EU-law principle that the Commission purports to derive from its authorities is

that "EU law enjoys primacy over any competing rules generated by EU Member States, whether

by domestic legislation or international treaty."  EC Br. 5, 19-23.  But this principle, much like the

Supremacy Clause in the United States, operates only *internally* to the EU legal system.  Bjorklund

Decl. II ¶¶ 63-70.  Just as a U.S. treaty that violates the U.S. Constitution, or a foreign treaty that

violates a foreign nation's constitution, may remain enforceable externally under international law,

*see* RREEF Br. 23-24, the EU courts' refusal to enforce a treaty under EU law does not relieve the

EU or its members of their international treaty responsibilities.  The Commission fails to identify

a single non-EU court or tribunal that has invoked the so-called "primacy" of EU law to excuse

any EU member from an international treaty.  To the contrary, non-EU courts such as the European

Court of Human Rights have held that complying with EU law is not a defense to violating an

international treaty.  *See* Bjorklund Decl. I ¶ 166 (citing *Matthews v. United Kingdom*, 28 EHRR

361, ¶¶ 26-35 (1999)).  If "primacy" applied outside of the EU, the EU and its members could

never reliably bind themselves to any treaty, not just intra-EU but with any nation, because the EU courts could nullify the treaty at any time by purporting to discover a latent conflict with EU law. This is precisely the problem that Vienna Convention Articles 27 and 46 sought to avoid by barring states from invoking their "internal law" to invalidate their treaty commitments.   RREEF Br. 23. The Commission has no response to these provisions.

The Commission derives its "primacy" principle from Article 351 of the TFEU, a provision of EU law (again, not international law) that addresses the effect of joining the EU on treaties entered "before the date of . . . accession."   TFEU, art. 351.   The only non-EU authorities the Commission cites on this issue—*Electrabel S.A. v. Hungary*, ICSID Case No. ARB/07/19, Award (Nov. 25, 2015), tiny.cc/6v18tz and U.N. General Assembly, Report of the Study Group of the Int'l Law EC, *Fragmentation of International Law: Difficulties Arising from the Diversification and Expansion of International Law*, UN Doc No. A/CN/4/L.682 (2006) ("Fragmentation Report")—address Article 351, not any general concept of "primacy," and confirm that the rule it establishes is much narrower than the general concept the Commission advances, even as a matter of EU law.   Consistent with the principle that a later treaty can supersede an earlier treaty, Article 351 assures that "inconsistent *earlier* treaties between Member States do not survive entry into the [EU]."   *Electrabel*, ¶ 4.183 (emphasis added).   But it "cannot apply to treaties made between EU Member States" *after* they join the EU.   *Id.* ¶ 4.180.   "Neither the wording of the article nor subsequent case-law accepts the extension of the provision to agreements concluded by member States after accession."   Fragmentation Report ¶ 284.   In other words, EU members retain authority under international law to enter *later* agreements like the ECT that modify their relations among each other.   The Commission cites no authority that saps the later treaty of force outside of EU courts.

The only *international* law principle the Commission invokes is that "sovereign States may regulate the relationship between present and future international treaties between those same

States by special rules." EC Br. 20.  But the ECT parties did precisely this:  Article 16 of the ECT provides that the treaty's dispute resolution provision shall supersede any prior and subsequent treaties that are less protective of investors' rights.  RREEF Br. 25-26; Bjorklund Decl. II ¶¶ 57-58.  Even absent that article, the ECT's terms would prevail over allegedly conflicting earlier adopted provisions of EU law, which the ECT displaced.  RREEF Br. 26.

At minimum, none of the Commission's international law arguments applies to Jersey. Bjorklund Decl. II ¶¶ 71-72; Dashwood Decl. II ¶ 68.  Jersey is a separate, non-EU sovereign that has not assented to the supposed "primacy" of EU law or to TFEU Article 351.  EU members' relations with Jersey are not "internal relationships."  The CJEU thus can no more unilaterally regulate the EU's relationship with Jersey investors like RREEF than it can Canadian investors.

## IV.   International Comity Cannot Override Congress's Mandate To Enforce The Award

The Commission finally argues that comity concerns weigh in favor of this Court abstaining from enforcing this Award.  While Spain mentioned comity in connection with its invocation of the doctrines of foreign sovereign compulsion and *forum non conveniens*, Spain Br. 24-30, the Commission's discussion of comity is unmoored from either doctrine.  Spain did not endorse the Commission's free-floating comity theory, so that argument, too, is forfeited.  It also lacks merit.

Comity is "simply a rule of construction" that cannot override congressional direction.  *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996).  It does not limit "the sovereign power of the United States to apply its law to situations involving one or more foreign contacts."  *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 382 (1959), *superseded by statute on other grounds*, *as recognized in Miles v. Apex Marine Corp.*, 498 U.S. 19, 33 (1990). And it applies only in "the absence of a contrary congressional direction."  *Id.*  Congress struck the balance on international comity, and its clear mandate that ICSID awards "shall" be enforced, 22 U.S.C. § 1650a(a), leaves no room for discretionary exercises of comity, which cannot

"override 'the emphatic federal policy in favor of arbitral dispute resolution,'" *Newco Ltd. v. Gov't of Belize*, 650 F. App'x 14, 16 (D.C. Cir. 2016); *see also* Bjorklund Decl. II ¶¶ 73-80.

The FSIA similarly "leaves no room" for a foreign state or regional body to invent additional "common-law" defenses "based on the very same considerations of comity" that underpin the FSIA. *Philipp v. Fed. Republic of Germany*, 894 F.3d 406, 416 (D.C. Cir. 2018). Congress has decided how these diplomatic considerations should be balanced, and the Commission's "'international comity'" concerns "are better directed to th[e] branch of government with authority to amend the [FSIA]." *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 146 (2014).

In any event, the central issue in this case—whether the Award can be enforced *in the United States* against Spain's assets *here* under the applicable U.S. law implementing the ICSID Convention—is not one that can be "addressed within the EU judicial system." EC Br. 24.[7] What the Commission really seeks is not abstention in favor of other courts; it is *non-enforcement* in the United States of a "binding" award that the United States is committed by treaty to enforce. ICSID Convention, arts. 53, 54. Comity cannot override that international commitment. And if "there is any doubt, national interests"—including the interest in fulfilling the treaty obligations of the United States in the manner specified by Congress—should be "be favored over foreign interests." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 951 (D.C. Cir. 1984).

## CONCLUSION

The Court should dismiss the arguments raised by the Commission, deny Spain's Motion to Dismiss and enter judgment on the Award in RREEF's favor.

---

[7]     The Commission's suggestion that the CJEU will soon decide the validity of intra-EU arbitration under the ECT, EC Br. 24, is wishful thinking. The cases the Commission cites either are not likely to reach the CJEU or do not require it to decide the issue. *See* Dashwood Decl. II ¶ 65 n.91. Indeed, the case referred by the Paris Court of Appeals *does not even involve intra-EU arbitration*—the Commission simply made a hail-Mary request to the CJEU, in the equivalent of an *amicus* brief, to address the issue even though it is not presented. *Id.* And none of the other cases even present the *possibility* of the CJEU ruling until at least 2022. *Id.*

Dated: January 25, 2021                    Respectfully submitted,

                                           /s/ Matthew McGill
                                           Matthew McGill, D.C. Bar #481430
                                           mmcgill@gibsondunn.com
                                           Matthew S. Rozen, D.C. Bar #1023209
                                           mrozen@gibsondunn.com
                                           Ankita Ritwik, D.C. Bar #1024801
                                           aritwik@gibsondunn.com
                                           GIBSON, DUNN & CRUTCHER LLP
                                           1050 Connecticut Avenue, N.W.
                                           Washington, D.C. 20036
                                           Telephone:  202.955.8500
                                           Facsimile:  202.467.0539

                                           *Attorneys for RREEF Infrastructure (G.P.) Limited
                                           and RREEF Pan-European Infrastructure Two Lux
                                           S.A.R.L.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 25, 2021, I caused the foregoing RREEF's Supplemental Brief in Response to the European Commission's *Amicus* Brief in Support of the Kingdom of Spain's Motion to Dismiss the Petition or Stay the Proceeding, and exhibits thereto, to be filed with the Clerk for the U.S. District Court for the District of Columbia through the ECF system. Participants in the case who are registered ECF users will be served through the ECF system, as identified by the Notice of Electronic Filing.

  /s/ Matthew McGill
Matthew McGill
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
mmcgill@gibsondunn.com